[Crim. No. 22388. Feb. 29, 1988.]

THE PEOPLE, Plaintiff and Respondent, v.
EDGAR M. HENDRICKS, Defendant and Appellant.

**COUNSEL**

Marcus S. Topel, under appointment by the Supreme Court, William M. Goodman, Ray H. Plumhoff, Lynne S. Coffin and Marianne D. Bachers for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Mark Howell, Thomas A. Brady, Gloria F. DeHart and

Charles R. B. Kirk, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**LUCAS, C. J.**—This is an automatic appeal (Pen. Code, § 1239, subd. (b); further statutory references are to this code unless otherwise indicated) from a judgment of death under the 1978 death penalty law (§ 190.1 et seq.). As we shall explain, we conclude that the judgment should be affirmed in its entirety.

Defendant was charged with murdering James Parmer and Charleston Haynes. (§ 187.) He was also charged with robbing the two men (§ 211) and with burglarizing Parmer's residence (§ 459). Four special circumstances were alleged: (1) felony murder for the Parmer robbery (§ 190.2, subd. (a)(17)(i)); (2) felony murder for the Parmer burglary (§ 190.2, subd. (a)(17)(vii)); (3) felony murder for the Haynes robbery; and (4) multiple murder (§ 190.2, subd. (a)(3)). (In a related case, *People* v. *Hendricks* (1987) 43 Cal.3d 584 [238 Cal.Rptr. 66, 737 P.2d 1350], we reviewed defendant's convictions of two additional murders, affirming the convictions but reversing the death penalty.)

In the summer of 1980 defendant was working as a "hustler"—a male prostitute for men—in San Francisco and Los Angeles. In the course of his trade he would also rob his customers. He had a paid sexual encounter with Joseph N. at the San Francisco residence the latter shared with victim Parmer, who was also homosexual. A few days later defendant returned to the residence and broke in. He shot Parmer six times at point-blank range, the last three times as Parmer lay unconscious on the floor. He then took various items including Parmer's checkbook, and fled. He subsequently had a paid sexual encounter with victim Haynes in the latter's San Francisco hotel room. He shot Haynes five times at point-blank range, the last three times as Haynes lay prone on a bed. He then took various items including Haynes's checkbook, and fled.

The jury found defendant guilty as charged on all counts except the robbery of Haynes; as to that count it found him guilty of grand theft, a lesser included offense. The jury also found all the special circumstance allegations to be true, with the exception of the allegation based on the robbery of Haynes.

In the penalty phase the prosecution presented evidence that in the summer of 1980 defendant also murdered Harry Carter and James Burchell—

who were both homosexuals—in Los Angeles, and Virginia Hernandez in Oakland. The defense introduced evidence to show that defendant had suffered neglect and abuse from his early years, and was the victim of homosexual rape as a teenager; defendant had a stable and responsible relationship with a woman and had acted as a father to her young son; in the summer of 1980, however, after the woman's son had been sexually abused by other boys and the woman had ended their relationship, defendant lost control of himself. The defense also presented the testimony of a psychologist, Dr. Linda Carson, who opined in substance that defendant had killed out of "homosexual rage"—i.e., under an irresistible impulse springing from fear that he was in fact homosexual. In rebuttal the prosecution called a psychiatrist, Dr. Victor Reus, who disagreed with Dr. Carson's opinion. He stated that defendant had the capacity to premeditate, deliberate, harbor malice, and form the specific intents to steal and kill.

The jury fixed the penalty at death, and judgment was entered accordingly.

I

## GUILT PHASE CONTENTIONS

Defendant raises a number of contentions relating to the issue of guilt; none, as we shall show, is meritorious.

### A. The Checkbooks

■ He first claims the court erred in failing to bar the introduction of Parmer's and Haynes's checkbooks as fruits of his allegedly unlawful arrest. Even if the court did err, however, the error was plainly harmless beyond a reasonable doubt. Subsequent to the challenged arrest, defendant fled from the state. After he was rearrested, he gave tape-recorded statements to the police. In these statements, which were played to the jury, he admitted taking the checkbooks.

### B. Cross-examination of Dr. Carson

■ Defendant next contends the court erred in ruling that Dr. Carson, the defense psychologist, would be subject to cross-examination on the Carter, Burchell, and Hernandez homicides if she testified. We disagree.

After the prosecution rested its case in the guilt phase, defense counsel informed the court that he would call Dr. Carson to give testimony on defendant's state of mind at the time of the killings. The prosecutor announced that if defendant tendered a mental defense, he would cross-exam-

ine the psychologist on the three uncharged homicides. Defense counsel objected. The court then conducted a hearing in camera to receive and evaluate counsel's offer of proof. Counsel established that Dr. Carson would testify in substance that defendant acted out of "homosexual rage" in the Parmer and Haynes homicides. The court ruled that if defendant tendered a mental defense through Dr. Carson's testimony, the prosecution would be entitled to cross-examine her on the uncharged homicides for impeachment purposes. Thereupon the defense rested without putting on any evidence.

Other-crimes evidence may be used to impeach the testimony of an expert witness. (See *People* v. *Nye* (1969) 71 Cal.2d 356, 373-376 [78 Cal.Rptr. 467, 455 P.2d 395]; *People* v. *Jones* (1964) 225 Cal.App.2d 598, 610-613 [37 Cal.Rptr. 454].) Because an expert witness may be cross-examined more extensively and searchingly than a lay witness, the court has broad discretion to admit such evidence for impeachment. (See *People* v. *Nye, supra,* at pp. 374-375; *People* v. *Jones, supra,* at pp. 610-613.)

No abuse of discretion appears here. Because Dr. Carson's "opinion . . . was at odds with the evidence introduced by the prosecution," the prosecutor was entitled to "attempt to discredit" it. (*People* v. *Nye, supra,* 71 Cal.2d at p. 376.) Defendant seeks to avoid this conclusion by arguing on the basis of *People* v. *Coleman* (1985) 38 Cal.3d 69 [211 Cal.Rptr. 102, 695 P.2d 189], that use of the uncharged homicides should have been barred as unduly prejudicial. But the evidence here appears to be both more probative and less prejudicial than the mentally ill woman's "[a]ccusatory statements 'from the grave,'" which were at issue in *Coleman*. (*Id.* at p. 93.)

### C. Failure to Instruct

Defendant further contends the court improperly refused three instructions. The first was a proposed modification of the standard instruction defining robbery (CALJIC No. 9.10)—specifically the addition of a paragraph to the effect there is no intent to deprive another of his property if the taker has a good faith belief that he has a right to such property. In his tape-recorded statements, defendant claimed he had broken into the residence shared by Joseph N. and Parmer in order to collect money each assertedly owed him for his services as a prostitute. He relies primarily on *People* v. *Butler* (1967) 65 Cal.2d 569 [55 Cal.Rptr. 511, 421 P.2d 703], but the case is distinguishable. ■ Defendant admitted his "right" was based on prostitution, and impliedly conceded he knew prostitution is illegal. The claim-of-right defense is inapplicable to claims based on notoriously illegal activities. (*People* v. *Gates* (1987) 43 Cal.3d 1168, 1181-1182 [240 Cal.Rptr. 666, 743 P.2d 301].)

The second proposed instruction concerned the time at which the intent to steal was formed: "If you have a reasonable doubt whether the defendant

formed an intent to steal from Mr. Parmer and/or Mr. Haynes before they were shot, then you are instructed that Mr. Parmer and/or Mr. Haynes were not killed in the perpetration of, or attempt to perpetrate, the crime of robbery." In refusing this charge the court expressly and correctly followed the long settled rule that an instruction that may confuse the jury should not be given. (*People* v. *Strange* (1882) 61 Cal. 496, 497.) Although they had the opportunity, defense counsel made no attempt to redraft the instruction. Relying on *People* v. *Whitehorn* (1963) 60 Cal.2d 256, 264-265 [32 Cal.Rptr. 199, 383 P.2d 783], defendant argues that the court had a duty to correct what he styles the "cosmetic problem" with the instruction. The argument misses the point. ■ The court gave CALJIC Nos. 8.21 and 9.10, which adequately cover the issue of the time of the formation of the intent to steal. Because the proposed instruction, even if properly drafted, "merely elaborate[s] upon the general instruction[s]," refusal to give it was not error. (*People* v. *Anderson* (1966) 64 Cal.2d 633, 640-641 [51 Cal.Rptr. 238, 414 P.2d 366].)

■ The third proposed instruction involved involuntary manslaughter. It is of course the rule that the court is under no duty to give a requested instruction when there is no substantial evidence in support. (*People* v. *Flannel* (1979) 25 Cal.3d 668, 684-685 [160 Cal.Rptr. 84, 603 P.2d 1] (plur. opn.).) "Involuntary manslaughter is . . . inherently an *unintentional* killing." (*People* v. *Broussard* (1977) 76 Cal.App.3d 193, 197 [142 Cal.Rptr. 664] (italics added); accord, *People* v. *Germany* (1974) 42 Cal.App.3d 414, 419 [116 Cal.Rptr. 841].) As the physical evidence established, defendant shot Parmer six times at point-blank range, the last three times as he lay on the floor unconscious; he shot Haynes five times at point-blank range, the last three times as he lay prone on the bed. In light of this evidence, defendant's self-serving tape-recorded statements denying an intent to kill cannot be deemed substantial in character. Therefore, the court did not err in refusing the involuntary manslaughter instruction.

### D. Denial of Mistrial

■ Defendant next contends the court erred in denying his motion for a mistrial based on an outburst in open court in which he admitted he was guilty of six murders. But a defendant may not be heard to complain when, as here, such prejudice as he may have suffered resulted from his own voluntary act. (See *People* v. *Harris* (1981) 28 Cal.3d 935, 951-953 [171 Cal.Rptr. 679, 623 P.2d 240], cert. den. 454 U.S. 882 [70 L.Ed.2d 192, 102 S.Ct. 365].)

### E. Photographs

■ Defendant's final contention relating to the guilt phase is that the court erroneously admitted certain photographs of Parmer and Haynes.

The point lacks merit. "Evidence Code section 352 vests the court with broad discretion to weigh the prejudicial effect of [such] evidence against its probative value." (*People* v. *Pierce* (1979) 24 Cal.3d 199, 211 [155 Cal.Rptr. 657, 595 P.2d 91].) No abuse of discretion appears. The "[p]hotographs which disclose the manner in which [the] victim[s] [were] wounded are 'relevant on the issue[ ] of malice . . . .' " (*People* v. *Frierson* (1979) 25 Cal.3d 142, 171 [158 Cal.Rptr. 281, 599 P.2d 587].) And they are no more, and indeed are perhaps less, shocking than many such exhibits. (See also *People* v. *Hendricks, supra,* 43 Cal.3d 584, 594-595.)

## II

### SPECIAL CIRCUMSTANCES CONTENTIONS

Defendant contends that each of the three special circumstance findings—felony-murder robbery (Parmer), felony-murder-burglary (Parmer), and multiple murder—must be vacated because the court failed to instruct the jury that it could find each of the allegations true only if defendant acted with intent to kill. The point must be rejected. ■ In *People* v. *Anderson* (1987) 43 Cal.3d 1104, 1147 [240 Cal.Rptr. 585, 742 P.2d 1306], we held that the court must instruct on intent to kill in connection with felony-murder or multiple-murder special circumstances when there is evidence from which the jury could find that the defendant was an accomplice rather than the actual killer. In this case, of course, defendant admitted he was the actual killer. He was thus not entitled to an instruction on intent to kill.

■ In an argument raised in conjunction with the claimed instructional errors, defendant contends that the evidence was insufficient to support the felony-murder-burglary and felony-murder-robbery special circumstances. We have already determined that, under these facts, defendant was not entitled to a special instruction on his claim-of-right defense, and that the standarized instructions (CALJIC Nos. 8.21 and 9.10) adequately covered the issue of the time of the formation of the intent to steal. (*Ante,* at pp. 642-643.) Defendant's paramour, Annette Stone, under a grant of immunity, testified that prior to the Parmer murder defendant left their motel room, announcing "[h]e was going to find a faggot, knock him over the head, and take his money." He later returned with Parmer's checkbook; Stone cashed a check for $255 by forging the victim's signature, turning the proceeds over to defendant. The jury found defendant guilty of the robbery of Parmer and the burglary of his residence. We conclude that there was sufficient evidence to support the felony-murder special circumstance findings in the present case.

III

PENALTY PHASE CONTENTIONS

Defendant raises a number of issues relating to the question of penalty. None, as we shall explain, has merit.

*A. Exclusion of Prospective Jurors*

 Defendant contends prospective jurors Forentino Solia, Deborah Wertheim, Mary Reyna, and Eileen Brown were improperly excused for cause because of their views on the death penalty. The record shows otherwise.

In *Witherspoon* v. *Illinois* (1968) 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770], the United States Supreme Court implied that a prospective juror could not be excused for cause unless, as relevant here, he made it "unmistakably clear" that he would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at trial of the case . . . ." (*Id*. at p. 522, fn. 21 [20 L.Ed.2d at p. 785], italics in original.) In *Wainwright* v. *Witt* (1985) 469 U.S. 412 [83 L.Ed.2d 841, 105 S.Ct. 844], however, the court reconsidered *Witherspoon* and declared that the proper standard was "whether the [prospective] juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" (*Id*. at p. 424 [83 L.Ed.2d at pp. 851-852].) We adopted the *Witt* standard in *People* v. *Ghent* (1987) 43 Cal.3d 739, 767 [239 Cal.Rptr. 82, 739 P.2d 1250].

Even under the *Witherspoon* standard, the exclusions here were proper. It is plain from the face of the record that, although their initial responses were somewhat ambiguous, the challenged jurors (Solis, Wertheim, Reyna, and Brown) ultimately made it unmistakably clear they would automatically vote not to impose the death penalty. The point must therefore be rejected.

*B. Other Crimes Evidence*

 Defendant contends that the introduction, pursuant to section 190.3, subdivision (b), of other-crimes evidence—specifically, the murders of Carter, Burchell, and Hernandez—denied him due process of law. In *People* v. *Balderas* (1985) 41 Cal.3d 144, 204-206 [222 Cal.Rptr. 184, 711 P.2d 480], however, we rejected the identical claim. Because defendant presents us with no reason to depart from our holding, we must reject his claim as well.

### C. Photographs

Defendant contends that the admission into evidence at the penalty phase of certain photographs constituted prejudicial error. The photographs at issue are exhibit 115, which depicts the position of the clothes on Virginia Hernandez's body; exhibit 117, which reveals a view of Hernandez's face in death; and exhibits 120 and 122, which show wounds on the body of Harry Carter. Defendant concedes that exhibits 117, 120 and 122 are relevant to the issue of penalty. He argues, however, that they should have been excluded as unduly prejudicial under Evidence Code section 352: exhibits 120 and 122, he says, are too gruesome; exhibit 117 is supposedly cumulative to other photographs in evidence. Further, he argues that exhibit 115 does not accurately depict the crime scene—the body, he asserts, had been moved before the photograph was taken—and therefore is irrelevant. As we shall explain, prejudicial error does not appear.

As to exhibits 117, 120 and 122, we doubt that defendant has carried his burden of showing that the court abused its "broad discretion to weigh the prejudicial effect of [such] evidence against its probative value" (*People* v. *Pierce, supra,* 24 Cal.3d at p. 211) when it admitted these photographs into evidence. Each of the photographs, as defendant concedes, is relevant and none appears to be unduly prejudicial: exhibits 120 and 122, although not pleasant to view, seem no more shocking than many similar photographs, and exhibit 117, as defendant himself admits, is not gruesome but merely duplicative of other photographs in evidence.

We also doubt that defendant has carried his burden of showing that exhibit 115 is irrelevant. The record contains testimony adequately explaining how the representation in the photograph differed from the crime scene in its original state. (See *People* v. *Isby* (1947) 30 Cal.2d 879, 891-892 [186 P.2d 405].)

But even if the court did err in admitting any or all of the four photographs at issue here, we cannot conclude that the error was prejudicial. Viewing the penalty phase as a whole, it seems clear that even if these photographs had not been admitted the outcome would have been the same.

### D. Dr. Reus's Testimony

Defendant contends that a portion of Dr. Reus's testimony was without proper foundation and should have been stricken. The facts necessary to resolve this claim are as follows.

Dr. Carson, the defense psychologist, gave testimony concerning defendant's mental state during the time relevant to the killings. Defendant then took the stand and engaged in the following colloquy.

"BY MR. BERMAN [defense counsel]: Q. Mr. Hendricks, when you were asked about if the [*sic*] care about the lives of other people and you said no, are you talking about now, or are you talking about July, August, September last year?

"A. At that particular time I didn't care about no one at all. I was at a, a rage, more or less. I were—I didn't care. Lee's Market on Revere Street is a case you don't know of at all. The sixth one, I got up and said that I was, six cases. That is the sixth one there.

"Q. Edgar, when this is over, would you like to talk to the police about that one.

"A. Yes, whatever.

"Q. Do you care about human life, now, other people's life?

"A. I care a great deal about human life. I care a great deal about people now."

The prosecutor then proceeded to cross-examine defendant on the Lee's Market murder.

"BY MR. MUNSON: Q. Are you telling us, Mr. Hendricks, that you killed a person at Lee's Market on Revere Street?

"A. A grocery store.

"Q. Is that in the City and County of San Francisco?

"A. In the Bayview Area.

"Q. When was this?

"A. Columbus Day.

"Q. Of what year?

"A. '80

"Q. What happened?

"A. Me and some other guy, friend of mine—you want to say—went into the store and robbed them, shot the guy then—didn't want to shoot the guy but—just the reason why I'm letting all this out now, I know I am going to get the death penalty anyway so I clear my own conscience.

"Q. Do you feel that that decision should be left up to the ladies and gentlemen of the jury rather than you, sir, of what penalty?

"A. Oh, yes.

"Q. You say that you didn't want to shoot the man at Lee's Market, but why did you shoot him?

"A. He tried to grab my gun."

The prosecutor called Dr. Reus to rebut the testimony of Dr. Carson. The following colloquy occurred.

"BY MR. MUNSON: Q. Doctor, leaving aside the sexual aspect for just a moment, the defendant out of your presence took the stand, and he testified in his own behalf, and part of his testimony, he indicated to all of us that he was engaged on Columbus Day 1980. He said he walked in with another chap to a grocery store. I believe he said it was on Revere Street. In any event, it was in the City and County of San Francisco. He was armed with a gun. [¶] He said, 'I want to rob the grocer.' He said, 'The grocer reached for the gun and I shot him.' [¶] Now, does that indicate, if these facts are true, does that indicate an ability on the part of the defendant to plan a crime, arm himself with a deadly weapon, and execute the crime?

"A. Well, certainly that report would indicate that, if that is the only information at hand, that the individual is capable of doing that, yes."

Defendant claims that the testimony of Dr. Reus quoted above was without proper foundation and should have been stricken. He argues in substance as follows: it is improper to ask an expert witness a hypothetical question that assumes facts not in evidence; to be admissible, the evidence of the other crime must prove that crime beyond a reasonable doubt; defendant's testimony, however, does not prove his guilt of the Lee's Market murder beyond a reasonable doubt; hence, it was improper for the prosecutor to ask the question he did; therefore, Dr. Reus's answer should have been stricken. The claim must be rejected.

To begin with, at least one of defendant's crucial premises is not true. ▬▬ It is simply not the case that "evidence of the other crime, to be admissible, must prove such crime beyond a reasonable doubt." (*People* v. *Holliman* (1969) 274 Cal.App.2d 89, 94 [78 Cal.Rptr. 826], citing Fricke & Alarcon, Cal. Criminal Evidence (6th ed.) Degree of Proof of Other Offenses, p. 293.)

In any event, the claim must be rejected at the threshold. ▬▬ It is, of course, "the general rule that questions relating to the admissibility of evidence will not be reviewed on appeal in the absence of a specific and timely objection in the trial court on the ground sought to be urged on appeal." (*People* v. *Rogers* (1978) 21 Cal.3d 542, 548 [146 Cal.Rptr. 732,

579 P.2d 1048], and cases cited.) Here, defense counsel made no objection whatever. Defendant's argument to the contrary is without merit. What he puts forth as an objection on the part of defense counsel was merely his request to continue closing argument in the face of what he called defendant's "bombshell" confession.

### E. Prosecutorial Misconduct

▮▮▮ Defendant contends that the prosecutor engaged in prejudicial misconduct in violation of the principles of *People* v. *Murtishaw* (1981) 29 Cal.3d 733 [175 Cal.Rptr. 738, 631 P.2d 446], when in his rebuttal to defense counsel's closing argument he made a comment going to the issue of "further dangerousness."

During his closing argument defense counsel stated as follows: "If you find that even within the prison system Edgar Hendricks has the ability to repent and rehabilitate his life, albeit within the prison system, I think you should vote for life, and I think you have seen that Edgar Hendricks is learning about himself, that he is not a monster, that he can learn from his mistakes and make a better person of himself."

In response to that comment, the prosecutor made the following statement. "[Mr. Berman] said that if you believe that the state prison system could rehabilitate him, and he has the ability to rehabilitate his life, that might be a factor indicating that punishment should be given. . . . You have to weigh and consider if he goes to prison what would happen if he's in a cell and somebody approaches him for sex or he's in a cell with a gay person. It's 3:00 in the morning and the guard is clear down the corridor. Now, all the guards and the wardens aren't going to prevent something terrible from happening."

Defendant claims that in making the comment quoted above the prosecutor engaged in prejudicial misconduct in violation of the principles of *People* v. *Murtishaw, supra,* 29 Cal.3d at pages 767-774, which holds that expert predictions of "future dangerousness" are generally inadmissible during the penalty phase of a capital trial. The claim must be rejected.

Initially, it appears that the prosecutor's comment was not improper. (See *People* v. *Davenport* (1985) 41 Cal.3d 247, 288 [221 Cal.Rptr. 794, 710 P.2d 861].) As we explained in *Davenport, Murtishaw* was concerned with limiting *expert* predictions of dangerousness, not prosecutorial argument on that topic. Here, the prosecutor made a brief response to defense counsel's comment about defendant's rehabilitative potential, and unlike the erroneously admitted expert testimony considered in *Murtishaw,* which "was the principal prosecution penalty phase evidence" (29 Cal.3d at p. 775), the

comment here was brief and—within the context of the penalty phase as a whole—plainly of minor significance. (See *People* v. *Miranda* (1987) 44 Cal.3d 57, 110-111 [241 Cal.Rptr. 594, 744 P.2d 1127].)

In any event, the claim is not properly preserved for review. First, defendant made no objection whatever at trial. Second, it is plain that a timely objection and admonition would have cured the harm: as we have explained above, the comment was brief and clearly of minor significance. Accordingly, defendant must be deemed to have waived the objection and the claim cannot be raised on appeal. (*People* v. *Green* (1980) 27 Cal.3d 1, 27-34 [164 Cal.Rptr. 1, 609 P.2d 468].)

### F. *Instructions on Mitigating Evidence and Sentencing Discretion*

 Defendant contends that the sentencing formula of section 190.3 is unconstitutional on the ground that it withdraws constitutionally compelled sentencing discretion from the jury. In *People* v. *Brown* (1985) 40 Cal.3d 512, 538-544 [230 Cal.Rptr. 834, 726 P.2d 516], vacated on other grounds *sub nom. California* v. *Brown* (1987) 479 U.S. 538 [93 L.Ed.2d 934, 107 S.Ct. 837], however, we rejected that very contention. Defendant presents us with no compelling reason to reconsider our holding.

Defendant contends that certain comments in the prosecutor's closing argument, combined with the mandatory language of the instructions based on section 190.3, may have misled the jury to his prejudice. We cannot agree.

Even though in *People* v. *Brown, supra,* 40 Cal.3d at pages 538-544, we rejected the claim that section 190.3 is unconstitutional, "We acknowledge[d] that the language of the statute, and in particular the words 'shall impose a sentence of death,' leave room for some confusion as to the jury's role," and added that "indeed, such confusion is occasionally reflected in records before this court." (*Id.* at p. 544, fn. 17.) For that very reason, we directed that "trial courts in future death penalty trials . . . instruct the jury as to the scope of its discretion and responsibility in accordance with the principles set forth in [*Brown*]." (*Ibid.*) We made it clear, however, that "We pass[ed] no judgment . . . upon the validity of death penalty verdicts previously rendered without benefit of . . . the instructions we [then] require[d]." (*Ibid.*) We concluded that "Each such prior case must be examined on its own merits to determine whether, in context, the sentencer may have been misled to defendant's prejudice about the scope of its sentencing discretion under the 1978 law." (*Ibid.*)

As we recently explained in *People* v. *Allen* (1986) 42 Cal.3d 1222 [232 Cal.Rptr. 849, 729 P.2d 115], "Our concern in *Brown* was that the una-

dorned statutory instruction might in two interrelated ways lead the jury to misapprehend its discretion and responsibility.

"First, we pointed out that the jury might be confused about the nature of the weighing process. As we observed: '[T]he word "weighing" is a metaphor for a process which by nature is incapable of precise description. The word connotes a mental balancing process, but certainly not one which calls for a mere mechanical counting of factors on each side of the imaginary "scale," or the arbitrary assignment of "weights" to any of them. Each juror is free to assign whatever moral or sympathetic value he deems appropriate to each and all of the various factors he is permitted to consider.' [Citation.]

"Second, we were concerned in *Brown* that the unadorned instruction's phrase, 'the trier of fact . . . *shall* impose a sentence of death if [it] concludes that the aggravating circumstances outweigh the mitigating circumstances' (italics added), could mislead the jury as to the ultimate question it was called on to answer in determining which sentence to impose. Although the quoted phrase could be understood to require a juror (i) to determine whether 'the aggravating circumstances outweigh the mitigating circumstances' without regard to the juror's personal view as to the appropriate sentence, and then (ii) to impose a sentence of death if aggravation outweighs mitigation even if the juror does not personally believe death is the appropriate sentence under all the circumstances, we concluded in *Brown* that the statute was not intended to, and should not, be interpreted in that fashion. Instead we stated: 'By directing that the jury "shall" impose the death penalty if it finds that aggravating factors "outweigh" the mitigating, the statute should not be understood to require any juror to vote for the death penalty *unless,* upon completion of the "weighing" process, *he decides that death is the appropriate penalty under all the circumstances.* Thus *the jury, by weighing the various factors,* simply *determines under the relevant evidence, which penalty is appropriate in the particular case.*'" (42 Cal.3d at pp. 1276-1277.)

As we recently observed in *People* v. *Ghent, supra,* 43 Cal.3d 739, 777, "A majority of the justices of the United States Supreme Court, upon reviewing our *Brown* decision, stressed the necessity of analyzing the record in each case to determine whether the jury instructions, taken as a whole, and read in conjunction with the prosecutor's arguments, adequately informed the jury of its responsibility to consider all of the mitigating evidence in the case. (See *California* v. *Brown, supra,* 479 U.S. 538, 546 [93 L.Ed.2d 934, 943, 107 S.Ct. 837, 842] (conc. opn. by O'Connor, J.), 561 [93 L.Ed.2d at p. 952, 107 S.Ct. at p. 850] (dis. opn. by Brennan, J.), 563 [93 L.Ed.2d at p. 943, 107 S.Ct. at p. 842] (dis. opn. by Blackmun, J.).) We have undertaken such a review, and we conclude that there exists 'no legitimate basis' (see

opn. of O'Connor, J., *id.*, at p. 546 [93 L.Ed.2d at p. 943, 107 S.Ct. at p. 842]) for believing that the jury was misled regarding its sentencing responsibilities." We draw a similar conclusion in the present case.

■ First, although the jury was instructed pursuant to former CALJIC No. 8.84.1 and its unadorned "factor (k)" language (see *People* v. *Easley* (1983) 34 Cal.3d 858, 878, fn. 10 [196 Cal.Rptr. 309, 671 P.2d 813]), we are confident that a reasonable jury would not have been led to believe it was to ignore defendant's proffered mitigating character evidence. Indeed, the prosecutor told the jurors that factor (k) allowed them to consider "any evidence at all in this record." We therefore find no factor (k) error.

■ Nor does it appear that the jury was misled regarding the nature of the weighing process, the first aspect of our concern in *Brown*. The prosecutor did not present the jury's weighing responsibility as a mere "mechanical" or "counting" process. His closing argument was short and evidently unimpassioned. (We set out pertinent portions of the argument in the appendix, *post,* p. 662.) He suggested that in undertaking the weighing process, the jury "might . . . draw a line down like a scale," list the aggravating circumstances on one side and the mitigating ones on the other, and "make a finding of fact" as to whether the aggravating factors "outweigh" the mitigating ones. But the prosecutor stopped short of telling the jury that it must impose death if the aggravating factors *outnumber* the mitigating ones. (See *People* v. *Myers* (1987) 43 Cal.3d 250, 275 [233 Cal.Rptr. 264, 729 P.2d 698], finding the prosecutor's use of a "scale motif" in his argument did not mislead the jury since he did not suggest that a mere mechanical "counting" process was involved.)

The prosecutor affirmatively explained that "What the law is telling you is that you *weigh* the aggravating and mitigating factors." (Italics added.) In using the "scale" analogy, the prosecutor simply suggested a mechanism by which the jurors could separate out the aggravating and mitigating factors before proceeding to their task of ascertaining the appropriate weight to be given them.

In addition, the prosecutor explained to the jury that (1) each juror must decide for himself whether a particular item of evidence should be deemed aggravating or mitigating; (2) the prosecutor's characterization of the evidence was itself not evidence in the case but merely was intended to offer "guidelines"; (3) there did exist some mitigating evidence or circumstances in the case, including the absence of any prior convictions. Furthermore, as noted, he told the jury that under "factor (k)" it could consider "any evidence at all in this record," including the testimony of all the witnesses.

Any ambiguity about the jury's weighing responsibility was certainly cured by defense counsel, who explained that the jurors must decide for

themselves what evidence in the case should be deemed aggravating or mitigating, and that "no one can tell you" what elements to find in deciding the penalty question. Then counsel observed that although the jurors could draw up a chart as suggested by the prosecutor, "it is up to you" what evidence belongs there.

Finally, counsel explained that although the sentencing instruction is indeed phrased in mandatory terms, nonetheless "you become the scale that this weighing process occurs on," there is room for "mercy within the framework of the law," and there is "no point system" involved in the process, because the weighing occurs within each juror. Counsel stressed that "you are all moral creatures" and each juror should base his penalty decision "on your own moral scale."

The prosecutor, in his final closing argument, conceded that he agreed with "practically everything" defense counsel had stated. He then urged the jurors to follow the law and "drive out influences that may detract from that pure judgment" needed in deciding the penalty issue.

Thus, the jury could not have been misled into thinking that it must impose death if the aggravating factors outweighed *in number* the mitigating ones. The prosecutor's reference to a "scale" was consistent with the jurors' *weighing* function, and the jurors were made well aware that they could decide whether particular evidence was aggravating or mitigating, and whether the mitigating factors called for an exercise of "mercy" on their part.

Turning to the second aspect of our concern in *Brown,* we believe the jury understood its obligation to determine whether or not death was an appropriate penalty for defendant. It is true, as defendant observes, that the prosecutor focused on the mandatory phrasing of the statutory instruction, that the jury "shall" impose death if the aggravating circumstances outweigh the mitigating ones; indeed, he described the process as an "automatic" one. But the prosecutor's argument was no different in substance from the argument in *People* v. *Allen, supra,* 42 Cal.3d 1222, 1279 [" 'Shall, not may, not might, not maybe. It is very explicit. If the aggravating evidence outweighs the mitigating evidence you shall return a verdict of death' "], which we concluded could not, on the facts of that case, have misled the jury. As we stated in *Allen,* it is not improper per se to instruct the jury that it "shall" impose death. (P. 1279, fn. 38.)

We acknowledge that *People* v. *Myers, supra,* 43 Cal.3d 250, 275-276, contains some language which might support defendant's position. There, the prosecutor urged that "Your job is a fact-finding process. The law dictates what the penalty shall be depending upon what weight you give,

what the total weight is to each aggravating or mitigating circumstance .... It would not be appropriate for you to determine what result you want to obtain and then seek to shade the factors or the weight to give to the various factors."

*Myers* concluded that this argument was improper, because the jury's task was "not simply to determine whether aggravating factors outweigh mitigating factors and then to impose the death penalty as a result of that determination, but rather to determine, after consideration of the relevant factors, whether under all the circumstances 'death is the appropriate penalty' for the defendant before it." (P. 276, quoting *People* v. *Brown, supra,* 40 Cal.3d 512, 541.)

*Myers* appears to be factually distinguishable. There, the prosecutor admonished the jury that, because of the mandatory phraseology of the instruction, it would be improper in deciding penalty to "shade the factors or the weight to give to the various factors" in order to reach a particular penalty. Such argument was misleading, for a reasonable juror might have construed it as meaning that he or she could not assign different weights or values to the various aggravating and mitigating factors.

Moreover, *Myers* was perhaps unduly critical of the prosecutor's reliance upon the mandatory language of the standard instruction. That language was directly taken from the 1978 death penalty law and accurately describes the jury's function under that law: to weigh the applicable aggravating and mitigating factors and, *on that basis,* and that basis alone, to determine whether death is an appropriate penalty. Of course, as we explained in *Brown, supra,* 40 Cal.3d 512, included within the weighing function itself is the determination whether death is an "appropriate" penalty under the circumstances. As we said in *Brown,* "the jury, by weighing the various factors, simply determines under the relevant evidence which penalty is appropriate in the particular case." (P. 541.)

Serious constitutional challenges could arise were we to instruct the jurors that they may place their decision as to the "appropriate" penalty upon some undefined criteria other than, or in addition to, a weighing of the aggravating and mitigating circumstances in the case. Such an instruction comes perilously close to violating the mandate of *Furman* v. *Georgia* (1972) 408 U.S. 238 [33 L.Ed.2d 346, 92 S.Ct. 2726], that the jurors must be given specified standards or guidelines within which to focus their discretion. Under *Furman,* we simply cannot tell the jury to "weigh all the factors, but *regardless of the outcome* do whatever you think is appropriate." Such an instruction would invite arbitrary decisions based on improper or irrelevant sentencing considerations including, for example, the defendant's race.

Thus, we see no impropriety in a prosecutor urging that the jurors "follow the law" and base their penalty decision on a weighing of the applicable factors, so long as it is understood that *inherent in the weighing process itself* is the determination of "appropriateness" that, as *Myers* explained, is so essential. As previously noted, the jury in the present case fully understood that it could assign whatever weight it deemed appropriate to the various aggravating and mitigating factors, and that its penalty decision should be based on *all* the evidence in the case. Therefore, viewing the record as a whole, we cannot conclude the prosecutor derailed the jury from a proper understanding of its duty to determine appropriateness of death through the weighing process.

■ Defendant additionally argues that the prosecutor's argument herein was objectionable under *Caldwell* v. *Mississippi* (1985) 472 U.S. 320 [86 L.Ed.2d 231, 105 S.Ct. 2633], wherein the high court condemned telling the jury of the availability of an appeal to the state Supreme Court in which the reviewing court would determine the "correctness" or "appropriateness" of the jury's sentencing decision. *Caldwell* deemed such argument impermissible because it could lead some jurors to believe "that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." (*Id.* at p. 329 [86 L.Ed.2d at p. 239].)

As we have explained above, however, *Caldwell's* concerns are not implicated here because we have concluded the jury was not misled into believing the determination of "death-appropriateness" rests elsewhere. We believe the prosecutor made it clear to the jurors from the very outset that the decision whether to impose the death penalty rested solely in their hands. In his opening remarks, the prosecutor explained to the jury that "you are going to have *one of the most important decisions that you will probably have to make in the course of your lifetime* because you are going to decide based on the evidence and the law whether a human being shall suffer life imprisonment or shall suffer death." (Italics added.)

The prosecutor observed that the "law" will provide much guidance in reaching the penalty decision, including specifying the various aggravating and mitigating factors upon which the penalty decision must be based. He also explained that once the jury concluded the aggravating circumstances outweighed the mitigating ones, a death sentence was "automatic." But at no time did the prosecutor attempt to "pass the buck" to another sentencing or reviewing body. On the whole, we believe the jurors thus realized that the ultimate sentencing responsibility was theirs, and theirs alone. No *Caldwell* error occurred here.

The judgment is affirmed.

Panelli, J., Arguelles, J., Eagleson, J., and Kaufman, J., concurred.

**MOSK, J.,** Concurring and Dissenting.—I concur in the affirmance of the judgment as to guilt and in the sustaining of the special circumstance findings.

I dissent, however, from the affirmance of the judgment as to penalty. In their discussion the majority have devised a novel means to satisfy the constitutional requirement of heightened reliability for a sentence of death: no matter how misleading the instructions and the arguments of counsel may be, the prosecutor will be deemed able to "cure" the harm if his statements to the jurors are correct in *some* respect, and a reviewing court will stamp its approval on the ultimate result—even if the prosecutor himself is responsible in large part for misleading the jurors, and even if the result of his erroneous argument is death. I cannot subscribe to such an unprincipled "rule," even when it is applied in the case of one of society's malefactors. The grim satisfaction of eliminating one repetitive criminal is not worth the damage to the fair and orderly administration of justice.

As I shall show, the majority opinion is contrary to the decision of the United States Supreme Court in *Caldwell* v. *Mississippi* (1985) 472 U.S. 320 [86 L.Ed.2d 231, 105 S.Ct. 2633], and to our decision in *People* v. *Brown* (1985) 40 Cal.3d 512 [230 Cal.Rptr. 834, 726 P.2d 516], reversed on other grounds *sub nomine California* v. *Brown* (1987) 479 U.S. 538 [93 L.Ed.2d 934, 107 S.Ct. 837]. Yet my colleagues ignore this authority in order, by any means, to inflict on this defendant what they perceive to be his just deserts.

Penal Code section 190.3 (hereafter section 190.3), adopted as part of the 1978 death penalty law, states in relevant part that "the trier of fact shall consider, take into account and be guided by the aggravating and mitigating circumstances referred to in this section, and shall impose a sentence of death if the trier of fact concludes that the aggravating circumstances outweigh the mitigating circumstances."

In *Brown* we held that the mandatory sentencing formula of section 190.3 was not unconstitutional in itself. (40 Cal.3d at pp. 538-544.) Nevertheless, we recognized that when delivered in an instruction the unadorned statutory language might mislead the jury as to the scope of its sentencing discretion and responsibility. (*Id.* at p. 544, fn. 17.) With respect to cases in which the jury had been instructed in the statutory language, we announced that we would examine each such appeal on its merits to determine whether the jury may have been misled to the defendant's prejudice. (*Ibid.*) This is such a case.

Our concerns in *Brown* were essentially two. The first was that the unamplified language of section 190.3 might mislead the jury as to the nature of the weighing process: "In [its] context, the word 'weighing' is a metaphor for a process which by nature is incapable of precise description. The word connotes a mental balancing process, but certainly not one which calls for a mere mechanical counting of factors on each side of the imaginary 'scale,' or the arbitrary assignment of 'weights' to any of them. Each juror is free to assign whatever moral or sympathetic value he deems appropriate to each and all of the various factors he is permitted to consider . . . ." (40 Cal.3d at p. 541.)

Our second concern was that the statutory language might mislead the jury as to the substance of the ultimate determination it was called on to make. Contrary to constitutional principles, that language "could be understood to require a juror (i) to determine whether 'the aggravating circumstances outweigh the mitigating circumstances' without regard to the juror's personal view as to the appropriate sentence, and then (ii) to impose a sentence of death if aggravation outweighs mitigation even if the juror does not personally believe death is the appropriate sentence under all the circumstances . . . ." (*People* v. *Allen* (1986) 42 Cal.3d 1222, 1277 [232 Cal.Rptr. 849, 729 P.2d 115].) In *Brown* we declared that the statutory language should rather be interpreted to require that the jury make " 'an individualized determination on the basis of the character of the individual and the circumstances of the crime' " (40 Cal.3d at p. 540, italics deleted), and thereby decide "which penalty is appropriate in the particular case" (*id.* at p. 541).

In the case at bar, the court instructed the jury in the potentially misleading words of section 190.3, without significant addition, deletion, or modification. Further, as will appear, the prosecutor's closing argument rendered those words *actually* misleading.

The prosecutor's argument was relatively short. After making some introductory remarks and "review[ing] the law" that governed the jury's determination, he quoted and expanded on several of the statutory sentencing factors. He then stated: "It is now your duty to determine which of the two penalties, death or confinement in the state prisons for life, without possibility of parole, shall be imposed. After having heard all of the evidence and having heard and considered the arguments of counsel, you shall consider and take into account and be guided by the applicable factors of aggravating and mitigating circumstances upon which you have been instructed. . . .

"If you conclude that the aggravating circumstances outweigh the mitigating circumstances, you shall impose a sentence of death. Again the word

'shall' is used. Now, is there a schoolteacher on the jury? Somebody must know the difference between 'may' and 'shall.' 'Shall' in ordinary parlance in its ordinary signification is a term of command and one which must be given a compulsory meaning and denoting obligation."

The prosecutor continued: "What the law is telling you is that you weigh the aggravating factors and the mitigating factors. So I'm going to discuss with you the aggravating factors and the mitigating factors. What you might do—and . . . ladies and gentlemen, there is nothing I can say or do to help you. This is a decision that you are going to have to make. All I can do is give you some help probably in maybe the way that you might logically go about performing your duty. You have—you might draw a big line and draw a line down like a scale.

"You might list all of the mitigating factors on one side of the scale, list all of the aggravating factors on the other side of the scale, and make a finding of fact and answer this question: Did the aggravating factors outweigh the mitigating factors? Or conversely: Did the mitigating factors outweigh the aggravating factors?

"Okay. What does the law tell you to do in that regard? If you conclude that the aggravating circumstances outweigh the mitigating circumstances, you shall impose a sentence of death. However, if you determine that the mitigating circumstances outweigh the aggravating circumstances, you shall impose a sentence of confinement in the State Prison without the possibility of parole.

"So once you make your findings of the facts, the law is somewhat automatic. The law tells you what to do. The law doesn't tell you how or what the facts are that you should find, but it helps you in this sense. If you find that the aggravating circumstances outweigh the mitigating circumstances, you shall impose the death penalty. If you find that the mitigating circumstances outweigh the aggravating circumstances, you shall impose life imprisonment.

"It doesn't give you any control over that. So the law is, pretty much automatically flows from the facts as you find them."

In concluding his argument the prosecutor told the jury: "I've given you some idea that I hope is at least helpful to you in arriving at this decision you have to make. Bear [that] in mind . . . if you find you have to look at the law because the law has been carefully structured. The law is aware that you have a very important decision to make.

"It takes a little bit of sting out in the sense that you have to decide facts. Once you decide, if you do, that the aggravating circumstances outweigh the mitigating circumstances, it's automatic. You shall impose death.

"So in that sense the law takes care of that burden or that portion of the burden. So what you are as you were at the first phase of the trial, you are finders of fact."

The closing argument of the prosecutor thus caused the very harm we feared in *Brown*. First, he misled the jury as to the nature of the weighing process. He told the jurors that just as in the guilt phase, they were "finders of fact" and their determination would be a "finding of fact." He also presented the penalty-fixing process as essentially a "mere mechanical counting of factors on each side of an imaginary 'scale' . . . ." (*Brown, supra,* 40 Cal.3d at p. 541.) Second, he misled the jury as to the substance of the ultimate decision it was called on to make. He told the jurors that the law compels them to vote for death if the aggravating factors outweigh the mitigating, regardless of their belief as to the appropriateness of that penalty—even though the law imposes no such compulsion (*ibid.*). Three times he erroneously called the death penalty "automatic" in these circumstances.

This understanding of the prosecutor's argument is unaffected by the fact that he also made certain comments that seem not to narrowly cabin the sentencing process; in context, these comments are both insubstantial and insignificant. Nor is it significant that in his own argument defense counsel stated, "I think [the prosecutor] gave you a most honest and honorable discussion," and then described the penalty determination as a moral assessment of the facts. Counsel's remark plainly constituted an attempt to ingratiate himself with the jury and subtly put his own words into the prosecutor's mouth; it certainly does not imply that the prosecutor's words could reasonably be understood other than in accord with their plain meaning. Finally, my conclusion is not affected by the prosecutor's comment in rebuttal that "I agree with practically everything counsel has said," a similar attempt at ingratiation.

Moreover, I am unable to conclude that defense counsel's description of the sentencing process as a moral assessment of the facts prevented the jury from being misled. In the face of the apparently mandatory language of the section 190.3 instruction and the prosecutor's repeated quotation, paraphrase, and explication of that language, counsel's argument would evidently be heard as little other than a plea that the jurors depart from their oaths and dispense a mercy that was not theirs to give under the law.

In addition to its effect on the potentially misleading instruction, the prosecutor's argument was independently objectionable under *Caldwell* v. *Mississippi, supra,* 472 U.S. 320, as an attempt to minimize the jury's sense of responsibility for determining the appropriateness of death.

In *Caldwell* the high court stated the relevant facts as follows. "In their case for mitigation, [Caldwell's] lawyers put on evidence of [his] youth,

family background, and poverty, as well as general character evidence. In their closing arguments they referred to this evidence and then asked the jury to show mercy. The arguments were in large part pleas that the jury confront both the gravity and the responsibility of calling for another's death, even in the context of a capital sentencing proceeding. . . .

"In response, the prosecutor sought to minimize the jury's sense of importance of its role." (472 U.S. at pp. 324-325 [86 L.Ed.2d at p. 237].) Specifically, he told the jurors that " '[defense counsel] would have you believe that you're going to kill this man and they know—they know that your decision is not the final decision. . . . Your job is reviewable.' " (*Id.* at p. 325 [86 L.Ed.2d at p. 237].) He went on: " 'The decision you render is automatically reviewable by the Supreme Court. Automatically . . . .' " (*Id.* at pp. 325-326 [86 L.Ed.2d at p. 237].)

The jury returned a verdict of death and the court sentenced the defendant accordingly.

The United States Supreme Court reversed the judgment as to penalty on the ground that "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." (*Id.* at pp. 328-329 [86 L.Ed.2d at p. 239].)

The court reasoned, in part, that an argument such as the prosecutor's was prejudicial in that it "offers jurors a view of their role which might frequently be highly attractive. A capital sentencing jury is made up of individuals placed in a very unfamiliar situation and called on to make a very difficult and uncomfortable choice. They are confronted with evidence and argument on the issue of whether another should die, and they are asked to decide that issue on behalf of the community. Moreover, they are given only partial guidance as to how their judgment should be exercised, leaving them with substantial discretion. [Citations.] Given such a situation, the uncorrected suggestion that the responsibility for any ultimate determination of death will rest [elsewhere] presents an intolerable danger that the jury will in fact choose to minimize the importance of its role." (*Id.* at pp. 332-333 [86 L.Ed.2d at p. 242].)

The court explained: "for a sentencer to impose a death sentence out of a desire to avoid responsibility for its decision presents the specter of the imposition of death based on a factor wholly irrelevant to legitimate sentencing concerns. The death sentence that would emerge from such a sentencing proceeding would simply not represent a decision that the State had demonstrated the appropriateness of the defendant's death. This would thus also create the danger of a defendant's being executed in the absence of

any determination that death was the appropriate punishment." (*Id.* at p. 332, fn. omitted [86 L.Ed.2d at p. 241].)

I apply this reasoning to the case at bar. At the penalty phase defense counsel urged the jury to confront its responsibility for determining, on the basis of an individualized moral assessment of the facts, whether defendant should be condemned to death. By contrast, the prosecutor repeatedly sought to minimize the jury's sense of its constitutional responsibility. As the quoted portions of his argument plainly show, he told the jurors in essence that the responsibility for deciding the appropriateness of death rested not on them but on a reification he called "the law," which made the ultimate penalty "automatic" if certain "facts" were "found." It was not they but "the law," he insisted, that bore the "burden" of condemning defendant to death.

Despite the majority's exercise in rationalization, I cannot consider either the *Brown* error or the prosecutor's independently objectionable argument to be harmless. In vacating the sentence of death in *Caldwell,* the high court explained: "This Court has always premised its capital punishment decisions on the assumption that a capital sentencing jury recognizes the gravity of its task and proceeds with the appropriate awareness of its 'truly awesome responsibility.' In this case, the State sought to minimize the jury's sense of responsibility for determining the appropriateness of death. Because we cannot say that this effort had no effect on the sentencing decision, that decision does not meet the standards of reliability that the Eighth Amendment requires. The sentence of death must therefore be vacated." (*Id.* at p. 341 [86 L.Ed.2d at p. 247].)

Until today, this court too had premised its capital decisions on the assumption that the jury recognizes its grave constitutional responsibility when it considers the question of life or death.

In the case at bar the *Brown* error threatened, and the prosecutor's argument sought, to minimize the jury's sense of that responsibility: the jurors were led to entertain the erroneous belief that it was "the law," and not they, who rendered the verdict. Because I cannot say that either the error or the independently objectionable argument was without effect, I cannot conclude that the jury's decision meets the reliability requirements of the Eighth Amendment.

For these reasons I would vacate the verdict of death and reverse the judgment as to penalty.

Broussard, J., concurred.

Appellant's petition for a rehearing was denied April 21, 1988, and the opinion was modified to read as printed above. Mosk, J., and Broussard, J., were of the opinion that the petition should be granted.

## APPENDIX

Defense counsel stated near the beginning of his own argument: "*I think Mr. Munson gave you a most honest and honorable discussion*. I don't want to use the word 'argument' in dealing with this state of the trial, and he didn't tell you that you must vote for the death penalty, or you must vote for life without possibility of parole, because he quite honestly told you that what you consider to be an aggravating circumstance is up to you, and how you want to view it; and what you consider to be a mitigating circumstance is up to you, and how you view it." (Italics added.)

The prosecutor opened the substantive portion of his argument with the following statement: "Now, you are going to have to make *one of the most important decisions that you will probably have to make in the course of your lifetime* because you are going to decide based on the evidence and the law whether a human being shall suffer life imprisonment or shall suffer death, and there's very little that I can give you or guide you on this decision, but there is an awful lot the law can give you, and there is an awful lot of things the law can provide for you in making this terrible important judgment on human life." (Italics added.)

The prosecutor then proceeded to "review the law" that governed the jury's determination. He began by quoting and expanding on several of the statutory sentencing factors. He continued: "It is now your duty to determine which of the two penalties, death or confinement in the state prisons for life, without possibility of parole, shall be imposed. After having heard all of the evidence and having heard and considered the arguments of counsel, you shall consider and take into account and be guided by the applicable factors of aggravating and mitigating circumstances upon which you have been instructed. Those were the things that I just read to you a minute or two ago, A, B, C, D.

"*If you conclude that the aggravating circumstances outweigh the mitigating circumstances, you shall impose a sentence of death. Again the word 'shall' is used. Now, is there a school-teacher on the jury? Somebody must know the difference between may and shall. Shall in ordinary parlance in its ordinary signification is a term of command and one which must be given a compulsory meaning and denoting obligation.*

"⋅ ⋅ ⋅ ⋅ ⋅ ⋅ ⋅ ⋅ ⋅ ⋅ ⋅ ⋅ ⋅ ⋅ ⋅

"Now, that is the law. What the law is telling you is that you weigh the aggravating factors and the mitigating factors. So I'm going to discuss with you the aggravating factors and the mitigating factors. What you might do—and, again, ladies and gentlemen, there is nothing I can say or do to help you. *This is a decision that you are going to have to make.* All I can do is give you some help probably in maybe the way that you might logically go about performing your duty. *You have—you might draw a big line and draw a line down like a scale.*

*"You might list all of the mitigating factors on one side of the scale, list all of the aggravating factors on the other side of the scale, and make a finding of fact and answer this question: Did the aggravating factors outweigh the mitigating factors? Or conversely: Did the mitigating factors outweigh the aggravating factors?*

"Okay. What does the law tell you to do in that regard? If you conclude that the aggravating circumstances outweigh the mitigating circumstances, you shall impose a sentence of death. However, if you determine that the mitigating circumstances outweigh the aggravating circumstances, you shall impose a sentence of confinement in the State Prison without the possibility of parole.

*"So once you make your findings of the facts, the law is somewhat automatic. The law tells you what to do.* The law doesn't tell you how or what the facts are that you should find, but it helps you in this sense. If you find that the aggravating circumstances outweigh the mitigating circumstances, you shall impose the death penalty. If you find that the mitigating circumstances outweigh the aggravating circumstances, you shall impose life imprisonment.

*"It doesn't give you any control over that. So the law is, pretty much automatically flows from the facts as you find them."* (Italics added.)

The prosecutor then considered at length the evidence presented during the trial under the several statutory factors. When he arrived at factor (k), he stated: "K, any other circumstance, any other circumstances which extenuate the gravity of the crime even though it is not a legal excuse for the crime. *That means that you can consider any evidence at all in this record. You can consider the testimony of all the witnesses. You can consider all of the photographs, all the physical evidence, everything."* (Italics added.)

As he concluded, the prosecutor stated: "I've given you some idea that I hope is at least helpful to you in arriving at this decision you have to make. Bear in mind that if you find you have to look at the law because the law has been carefully structured. The law is aware that you have a very important decision to make.

*"It takes a little bit of sting out in the sense that you have to decide facts. Once you decide, if you do, that the aggravating circumstances outweigh the mitigating circumstances, it's automatic. You shall impose death.*

"So in that sense the law takes care of that burden or that portion of the burden. *So what you are as you were at the first phase of the trial, you are finders of fact. You are judges. You are the deciders.* Obviously, you could—nobody can stop you—from being arbitrary, from being capricious. *You could all say, well, the aggravating circumstances do outweigh the mitigating circumstances, but the heck with it. I'm just not going to do it.*

"I can't stop you from that. The people you live with in your community can't stop you from doing that. The only thing I can tell you is that you did take an oath." (Italics added.)

After opening his argument with the comment about the prosecutor's "most honest and honorable discussion," defense counsel proceeded to compare the guilt and penalty phases of a capital trial.

"[W]e have had two stages in this trial, and the first stage you heard evidence. You heard argument. You were given instructions, and you made a decision.

"In this stage you have heard evidence. You have heard arguments. You will be given instructions, and you will arrive at a sentence.

"But those two stages have only that kind of shallow similarity. They are very different. In the first stage you were told that there are certain crimes alleged, and you were instructed by the Court that each of those crimes has certain elements, facts that must be proved, and that the standard you use is proof beyond a reasonable doubt.

"Proof beyond a reasonable doubt isn't a mathematical formula, but it is not so hard to understand. It basically means you are very, very sure. So you can take that standard. It was almost like you do see a scale in front of you, and look at the facts, and do those facts come up to prove beyond a reasonable doubt, and you did that.

"You did your job. You knew what elements you were looking for, but here in this stage there is no special facts that are trying to be proven to you. There is no way anybody can tell you what elements you must find before you arrive at the death penalty or life without possibility of parole.

*"You can say, you can draw a chart with aggravating on one side, mitigating on the other, but what you decide is aggravating or mitigating is up to you, and the worst part of it is how do you compare? What is the formula?*

*"And I think that is what Mr. Munson quite honorably told you. It's up to you to decide. The law tells you that you shall impose one penalty if you find the aggravating factors outweigh the mitigating. You shall impose the other if the mitigating outweigh the aggravating. But this outweighing is not something to take outside you. It can only be internalized. You become the scale that this weighing occurs on, and I think that Munson was very honorable with you in not standing up here and saying somehow the law insists you find one penalty and/or the other,* and I hope I'm going to be just as honorable." (Italics added.)

Defense counsel then proceeded to argue for the imposition of life imprisonment without the possibility of parole. He stated and explained his general opposition to the dealth penalty. He then asked the jury to exercise mercy in consideration of the hard life defendant had been forced to lead and the redeeming qualities he had nevertheless shown. He told the members of the jury; *"You are the scales on which this aggravating and mitigating must be weighed, and that means that what you are as people comes into play in making this decision. You are not a jury of jackals, of lions, or ants, or of computers. You are human beings. That means you are moral animals, and it is on your own moral scale that you will make this decision."* (Italics added.)

Defense counsel concluded: "The decision is yours. I hope that God grants you wisdom to make the right decision, what it is. I have faith in you, ladies and gentlemen. The decision is yours."

The prosecutor then made a brief rebuttal. In opening he stated: "I have given you the law and principles of law. I have gone over each of the elements of aggravation and mitigation. *I've tried to give you some rational way of determining the terrible decision that you have to make. I agree with practically everything counsel had said. Believe me, it's tough to me, too.* [¶] *It's tough on the judge. It's tough on you. It's tough on everybody. These are very difficult things to do in a society, but that's what we* have. We have courts of law. We have people from the community in which these people are charged to come in and sit in judgment of them. *I simply want to get you in the framework of the mind of a judge, the moral mind, the fair mind, the mind that will take all of the issues, all of the evidence, dispassionately weigh and consider, render an honest, fair and a true verdict."* (Italics added.)

In response to defense counsel's statement about defendant's rehabilitative potential, which is quoted above, the prosecutor then made the comment about defendant and a homosexual cellmate, which is also quoted above.

At the conclusion, the prosecutor made the following statement: "And last, what I'm saying is you are you, but you are us. You are society. You can be selfish. You can't say, 'Well, gee, I want to do this. I want to do that.'

"I wish you could have that luxury. You don't have that luxury. We have stripped you of that. You are representing all of us. You don't have this individual luxury. You took an oath, 'I will follow the law. I will follow the instructions of the Court.' Because you are representatives of the people, all of us, and I'm not going to go on to any more things. I've had my say.

"I think Mr. Berman had his say. I just want to remind you to follow the law. When you decide the facts, remember, please, please, you sit as judges. Drive out influences that you think may detract from that pure judgment that is needed in this decision. Drive out things that start creeping into your mind that you feel would render anything less than a pure, honest, open, fair judgment because if you do that, the quality of your judgment will be reflected in your verdict, whatever it may be."