**Edgar M. HENDRICKS, Petitioner,**

v.

**Arthur CALDERON,[1] in his capacity as Warden of California State Prison at San Quentin, Respondent.**

**No. C–89–2901 EFL.**

United States District Court, N.D. California.

June 2, 1994.

1. Name substituted pursuant to Rule 25 of the Federal Rules of Civil Procedure.

William M. Goodman, Topel & Goodman, San Francisco, CA, for petitioner.

Martin Kaye, Asst. California Atty. Gen., San Francisco, CA, for respondent.

## ORDER DENYING PETITION FOR RELIEF FROM THE CONVICTION AND GRANTING PETITION FOR RELIEF FROM THE SENTENCE

LYNCH, District Judge.

### I. Introduction

Edgar Hendricks is in state custody under sentence of death following his conviction for robbery, burglary, and two counts of first-degree murder with special circumstances. Hendricks alleges that his conviction and sentence were obtained in violation of his federal constitutional rights. In particular, Hendricks alleges that he was denied his Sixth Amendment right to effective assistance of counsel in both the guilt and penalty phases of his trial.

### II. Background [2]

#### A. State proceedings: guilt phase

Hendricks was tried in San Francisco in November 1981 for the murders of James Parmer and Charleston Haynes. Hendricks confessed to killing Parmer and Haynes and to committing another two homicides in Los

---

**2.** Throughout this order, citations to the state court record are made by volume number and page of the reporter's transcript ("Volume number RT Page number").

Angeles[3] and one more in Oakland.[4] All of the killings occurred within a two-month period.

The jury heard Hendricks's confession, though not the portions relating to the Los Angeles and Oakland killings. Trial counsel presented no case in the guilt phase, but argued to the jury that Hendricks's confession showed that he did not premeditate and that he stole from the victims as an afterthought to killing them. Trial counsel therefore urged the jury to reject first-degree and felony murder.

The jury found Hendricks guilty of one count of robbery, one count of burglary, and two counts of first-degree murder with special circumstances.

## B. State proceedings: penalty phase

The penalty phase began four days after the jury reached its verdict on Hendricks's guilt. The prosecution presented extensive evidence in aggravation about the Los Angeles and Oakland killings.

Defense counsel presented three witnesses. Dr. Linda Carson, a psychologist who examined Hendricks before trial, testified about events in Hendricks's life that led him to kill Parmer and Haynes in what Dr. Carson described as an explosion of rage. Rowena Bates, Hendricks's ex-girlfriend, and Hendricks himself also testified. The jury deliberated for less than a full day before returning a verdict of death.

On automatic appeal, the California Supreme Court affirmed Hendricks's conviction and sentence. *See People v. Hendricks,* 44 Cal.3d 635, 244 Cal.Rptr. 181, 749 P.2d 836 (1988). Hendricks's state habeas petition was also denied. *See In re Hendricks,* (May 4, 1989).

## C. Federal Proceedings

This matter first came before the district court in a petition filed by Hendricks in August 1989. The case was assigned to Judge Vukasin. Following a summary denial of relief, the Ninth Circuit reversed and remanded for reconsideration of Hendricks's petition. *See Hendricks v. Vasquez,* 908 F.2d 490 (9th Cir.1990). After reconsideration of Hendricks's amended petition, the district court again denied relief. The Ninth Circuit affirmed the denial of relief except for Hendricks's two ineffective assistance of counsel claims. The appeals court remanded the case with instructions to hold an evidentiary hearing on these issues. *See Hendricks v. Vasquez,* 974 F.2d 1099 (9th Cir.1992).

The parties agreed to conduct the hearing by way of videotaped testimony. The parties presented pre- and post-hearing briefing, exhibits, and videotaped testimony from seven witnesses.[5] Judge Vukasin was not present when the testimony was videotaped over a period of six days in March 1993. Judge Vukasin passed away before issuing his ruling. The case was reassigned to Judge Lynch.

## III. Discussion

Hendricks argues that his trial counsel[6] was ineffective in both the guilt and penalty phases of his trial. Hendricks contends that trial counsel should have presented a diminished capacity or insanity defense in the guilt

---

**3.** In 1983 Hendricks was tried and sentenced to death for the Los Angeles murders. Following a retrial on guilt and a hearing on sanity, Hendricks was found sane and convicted of capital murder. The penalty phase was retried twice. Hendricks was sentenced to life without possibility of parole when the jury could not reach a decision on the second penalty retrial and the prosecutor decided not to try the penalty phase a third time.

**4.** Hendricks was never charged with the Oakland murder.

**5.** The evidentiary hearing testimony discussed in this order is cited by the initials of the witness, followed by the page number. The abbreviations are as follows: first chair defense counsel (RB); second chair defense counsel (MG); Dr. David Lisak (DL for citations to his testimony and DL Dec. for his declarations); Dr. Richard Dudley (RD); Dr. George Back-y-Rita (GB for his testimony; GB Notes for the notes that he made when interviewing Hendricks); James Larson (JL); Michael Thorman (MT).

**6.** Hendricks was represented by two attorneys at trial: first chair counsel and second chair counsel. Both attorneys testified at the evidentiary hearing that second chair counsel had no significant role in trial preparation or strategy in Hendricks's case. Respondent has not contested this assertion. Accordingly, the discussion of Hendricks's ineffective assistance claims refers to counsel in the singular.

phase. Hendricks also maintains that trial counsel was ineffective for failing to present additional mitigating evidence in the penalty phase. Hendricks argues that he was prejudiced by counsel's deficient performance in both the guilt and penalty phases of his trial.

## A. Legal Standard

*Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984), sets forth the now-familiar two-prong standard for analyzing ineffective assistance of counsel claims.

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

The petitioner must prevail on both parts of the *Strickland* test to obtain relief though in rare cases prejudice may be presumed. *See Strickland,* 466 U.S. at 692–93, 104 S.Ct. at 2067; *see also Frazer v. United States,* 18 F.3d 778, 785, (9th Cir.1994). The petitioner bears the burden of proof on both parts of the test. *See Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064; *see also Kimmelman v. Morrison,* 477 U.S. 365, 381, 106 S.Ct. 2574, 2586, 91 L.Ed.2d 305 (1987).

**7.** Respondent maintains that, under the Supreme Court's recent decision in *Lockhart v. Fretwell,* — U.S. —, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993), Hendricks must make a separate showing that he was deprived of a fair trial, "a trial whose result is reliable," *see Fretwell,* — U.S. at —, 113 S.Ct. at 842, in addition to demonstrating deficient performance and prejudice.

In *Fretwell,* trial counsel neglected to make an objection that, although meritorious at the time of trial, was no longer meritorious when the issue was raised in federal habeas proceedings.

## 1. Performance

■ To minimize the "distorting effects of hindsight," *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065, the challenged conduct should be evaluated from counsel's perspective at the time, taking into account all of the circumstances. *Strickland,* 466 U.S. at 689–90, 104 S.Ct. at 2065–66. Furthermore, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged conduct might be considered sound trial strategy." *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065 (internal quotations and citation omitted).

■ Strategic choices made among plausible options after thorough investigation of the facts and applicable law are "virtually unchallengeable." *Strickland,* 466 U.S. at 690, 104 S.Ct. at 2066. By contrast, strategic choices that follow an investigation that is less than complete are reasonable only if the decision to limit investigation is itself a reasonable professional judgment. *Strickland,* 466 U.S. at 691, 104 S.Ct. at 2066. "In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland,* 466 U.S. at 691, 104 S.Ct. at 2067.

## 2. Prejudice

The petitioner must show "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068.[7] A petitioner need not show by a

The authority supporting the objection had been overruled by the time Fretwell's case reached federal court. The Supreme Court found that Fretwell suffered no prejudice because counsel's failure to make the objection did not deprive Fretwell "of any substantive or procedural right to which the law entitles him." *Fretwell,* — U.S. at —, 113 S.Ct. at 844.

This court has found no authority supporting respondent's view that *Fretwell* adds a new inquiry to the standard *Strickland* analysis. *See Fretwell,* — U.S. at —, 113 S.Ct. at 845–46

preponderance of the evidence that the result of the trial would have been different absent trial counsel's deficient performance. *Strickland,* 466 U.S. At 693–94, 104 S.Ct. at 2067–68.

*Strickland* elaborates on the prejudice standard by articulating specific tests for the guilt and sentencing phases of a capital proceeding. In the guilt phase, "the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Strickland,* 466 U.S. at 695, 104 S.Ct. at 2068. In the sentencing phase, "the question is whether there is a reasonable probability that, absent the errors, the sentencer ... would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland,* 466 U.S. at 695, 104 S.Ct. at 2068.

With these standards in mind, Hendricks's guilt and penalty phase claims that he received ineffective assistance of counsel are discussed below in sections B and C, respectively.

## B. Analysis: guilt phase

Hendricks's ineffective assistance of counsel claim in the guilt phase is twofold. First, Hendricks argues that trial counsel's choice of defense strategy was unreasonable. Second, Hendricks argues that trial counsel failed to carry out the defense strategy in a competent manner.

### 1. Choice of defense strategy

Hendricks argues that trial counsel was unreasonable in rejecting an insanity or diminished capacity defense without first conducting an adequate investigation of Hendricks's personal and family background. Respondent argues that trial counsel's strategy choice was reasonable and emphasizes that trial counsel are not required to shop around for a psychiatrist who will render a more favorable opinion.

(O'Connor, J., concurring). Rather, *Fretwell* merely applies the *Strickland* test for prejudice to the unusual and specific facts of a particular case.

### a. Evidentiary hearing testimony

Before trial, counsel had Hendricks evaluated by a psychiatrist, Dr. George Bach-y-Rita. RB 30. Counsel ordered the evaluation because the facts of the crime along with Hendricks's own confession indicated that "it was obvious there was a psychiatric problem." RB 31. On the advice of Dr. Bach-y-Rita, Berman then hired Dr. Linda Carson, a psychologist, to conduct psychological testing on Hendricks. RB 41.

Counsel hired Dr. Carson at the beginning of September, just over one month before jury selection started in Hendricks's trial. RB 42–43. Counsel asked Dr. Carson to evaluate Hendricks and, in particular, to render an opinion whether there was any basis for an insanity defense. RB 45. Counsel gave Dr. Carson a copy of Hendricks's taped confession and the preliminary hearing transcript as background for her interview with Hendricks. RB 43.

After receiving the results of Dr. Carson's evaluation of Hendricks, Dr. Bach-y-Rita reported to counsel that he did not believe that he could assist counsel with either an insanity or a diminished capacity defense. RB 93–94. Counsel testified that Dr. Bach-y-Rita diagnosed Hendricks as a sociopath. RB 93. In light of these results, counsel did not ask Dr. Bach-y-Rita to prepare a written report, RB 93, and decided not to present an insanity or diminished capacity defense.

Counsel testified at the evidentiary hearing that he hired outside investigators but did not assign them to research Hendricks's personal or family background. RB 35–36; MG 26, 30.[8] The investigation file contained a note by the investigator indicating the need to do a social history investigation. RB 97; RS 26–27. Apparently trial counsel and the investigator discussed this task but counsel did not follow up. RB 97–98; RS 27. Counsel testified that he did not ask the investigators to conduct investigation related to pre-

8. Counsel hired the investigative firm of Josiah ("Tink") Thompson within a month of receiving the case. A member of the firm, Russell Stetler, did most of the investigative work on the Hendricks case. RB at 30.

senting a mental defense for Hendricks in the guilt phase of his trial. RB 35.[9]

Hendricks presents declarations and testimony from two mental health experts to demonstrate the extent and significance of the information that trial counsel failed to discover.[10] That testimony is summarized below.

Dr. David Lisak, a clinical psychologist specializing in childhood sexual trauma, testified at the evidentiary hearing and submitted a lengthy declaration summarizing Hendricks's life and family history. Dr. Lisak testified that social history investigation is crucial for evaluating an individual because the individual may lack perspective or information about himself and about his immediate and extended family. Consequently, the individual may be an incomplete or even biased source of social history data. DL 20–22.

Dr. Lisak's declaration highlighted many significant traumatic events in Hendricks's life. Accompanying Dr. Lisak's declaration are exhibits documenting Hendricks's family background. Hendricks's social history, as described by Dr. Lisak, is summarized below.

Hendricks's mother died giving birth to him. DL 31. Throughout Hendricks's life, family members blamed him for causing his mother's death. Hendricks also held himself responsible. DL Dec. 44–45.

Hendricks was an asthmatic child who spent the first three years of his life with a maternal aunt. Hendricks's aunt wanted to adopt him. DL 33; DL Dec. 39. His father would not permit the adoption and, at age three, Hendricks was sent to live with his grandmother and fifteen relatives in a two-room house in Alabama. DL 18–19, 31. Hendricks's grandmother disciplined the children by hitting them with a frying pan or a switch. DL 34. She had the children drink kerosene mixed with sugar as medicine. DL Dec. 43.

Hendricks was sexually abused at least three times before he was ten. DL 52–53; DL Dec. 54–58. At this age, Hendricks moved to Ohio to live with his father. Hendricks's father ran the house as a brothel who would rent out the children's beds to customers. Hendricks was sexually abused by prostitutes in the house and by his stepmother. DL 43–46, 48.

Hendricks's father found out about the sexual relationship between Hendricks and his stepmother. Hendricks then left Ohio and moved to Detroit to live with his brother. Soon after he arrived, Hendricks was raped by a stranger who picked him up at a bus stop. Immediately after the assault, Hendricks attempted suicide with sleeping pills. DL 64–66; DL Dec. 62–63.

Two weeks later, Hendricks moved to New York. DL Dec. 64. Hendricks supported himself working as a "murphy" for a woman prostitute. As a "murphy," Hendricks would protect the woman and help collect money from her clients.

Hendricks married for the first time when he was eighteen. He had a son who died in infancy from a rare skin disease. DL 70, 73; DL Dec. 66.

Hendricks began using heroin heavily after his son's death. Hendricks's heroin use initially began when he was seventeen. A year after his son's death, Hendricks entered a methadone clinic for treatment but did not complete the program. DL Dec. 68–69. Hendricks's severe mood swings and substance abuse led to divorce. DL 76.

Hendricks eventually moved to Portland and began a relationship with Rowena Bates.

**9.** Counsel testified that the investigator worked on the Hendricks case over a three to four month period. RB at 32. Counsel gave the following assignments to the investigator: (1) locating Annette Stone, a woman who was with Hendricks during the time of the killings; (2) investigating the prior criminal history of Charleston Haynes; (3) investigating Nelson, Parmer's roommate, to determine whether he owned a firearm; (4) investigating the circumstances of Hendricks's initial confession, made to an FBI officer in Texas before Hendricks was returned to California. RB at 33–34. Counsel testified that he gave the investigators only these specific assignments and did not give discretion to pursue other areas. RB at 35.

**10.** Habeas counsel has since prepared a social history of Hendricks. It is undisputed that the information presented in the social history was available at the time of Hendricks's trial.

He became very close to her nine year-old son Teal. DL 81. The boy was raped when Hendricks and his girlfriend Rowena Bates were away on vacation. Hendricks was devastated because of his own rape trauma. DL 84–86. Hendricks began drinking and using drugs heavily. As a result, Rowena Bates and her son Teal left Hendricks and moved to Seattle. Hendricks then began drifting and supporting himself through prostitution. DL Dec. 77. During this time he continued to drink heavily. DL Dec. 77.

According to Dr. Lisak, Hendricks's extended family has a high incidence of mental illness, substance abuse, suicide and attempted suicide. DL 27–37; *see* Exhibits 2–51 accompanying DL Dec. Dr. Lisak believes that Hendricks is genetically predisposed and vulnerable to serious mental illness. DL 17–18. This genetic predisposition is exacerbated by Hendricks's violent and traumatic upbringing DL 18–20.

Hendricks also provided testimony from Dr. Richard Dudley, a psychiatrist. Dr. Dudley reviewed the social history data and conducted several interviews with Hendricks. Dr. Dudley concluded that Hendricks suffered from schizoaffective disorder, posttraumatic stress disorder, and polysubstance abuse. RD 18. Dr. Dudley stated that had he been called to testify at the trial, he would have testified that Hendricks was insane and that he had diminished capacity at the time of the homicides. In addition, Dr. Dudley would have testified as mitigating evidence in the penalty phase that Hendricks was under the influence of extreme emotional disturbance and unable to conform his conduct to the requirements of law.

#### c. Analysis

Hendricks argues that trial counsel rejected a viable defense because they relied unreasonably on the uninformed conclusions of Drs. Bach-y-Rita and Carson. For Hendricks, the fault lies with trial counsel for failing to provide adequate background data to the mental health experts. For the reasons explained below, the court does not find that trial counsel made an unreasonable tactical decision when he rejected the insanity and diminished capacity defenses in reliance on the opinions of Drs. Bach-y-Rita and Carson.

The record shows that trial counsel resolved as a matter of strategy that keeping the evidence of the Los Angeles and Oakland homicides from the jury was of paramount importance. RB 65–69. It is undisputed that the other crimes evidence would have been admitted if trial counsel had presented a diminished capacity or insanity defense.

Trial counsel considered the possibility of presenting a diminished capacity or insanity defense and had Hendricks evaluated by two mental health professionals for that purpose. At the same time, trial counsel accurately anticipated that the jury could be unduly prejudiced against Hendricks in the guilt phase if evidence of the Los Angeles and Oakland murders were admitted. Considering this risk in light of the doctors' evaluations of Hendricks, trial counsel made a reasonable decision not to further explore the possibility of presenting an insanity or diminished capacity defense.

Hendricks's argument that trial counsel's strategy decision cannot have been reasonable because it was based on inadequate investigation is unavailing. The court recognizes that a strategic decision made by trial counsel without adequate investigation cannot be presumed reasonable. *See Strickland*, 466 U.S. at 668, 104 S.Ct. at 2052. In this case, however, it is not accurate to say that trial counsel conducted no investigation. Although trial counsel did not conduct a social history investigation, he did have Hendricks examined by two mental health professionals to explore the possibility of presenting a diminished capacity or insanity defense. The results of those examinations did not bode well for the success of this defense. Considering that, as noted above, the risks associated with presenting such a defense were substantial, trial counsel cannot be said to have made an uninformed or baseless choice when he decided not to explore an insanity or diminished capacity further.

Hendricks's case is therefore distinguishable from those in which a strategy decision was determined to be unreasonable because it was predicated on little or no investigation by counsel and where trial counsel had no

reason for limiting the investigation.[11] Trial counsel's testimony, considered in light of the record as a whole, reflects a definite overall strategy of keeping the jury from hearing about the Los Angeles and Oakland murders. Furthermore, Drs. Bach-y-Rita and Carson knew most of the salient details of Hendricks's life when they evaluated him. The only significant fact unknown to the doctors was the history of mental illness and substance abuse on both sides of Hendricks's family.[12]

On the facts of this case, trial counsel's performance in the guilt phase with regard to investigation and consideration of a possible insanity or a diminished capacity defense was not unreasonable.[13] Accordingly, the

question whether Hendricks was prejudiced by trial counsel's performance need not be resolved. *See Strickland*, 466 U.S. at 697, 104 S.Ct. at 2069.

**2. Implementation of defense strategy**

 The second part of Hendricks's guilt phase claim is that trial counsel was ineffective in implementing the chosen defense strategy. Respondent disagrees, and argues that counsel made a reasonable strategic decision that did not prejudice Hendricks.

**a. State proceedings**

Trial counsel intended to offer the testimony of Dr. Carson to undermine the prosecu-

---

**11.** *See, e.g., Deutscher v. Whitley*, 884 F.2d 1152, 1159–60 (9th Cir.1989), *vacated on other grounds sub nom. Angelone v. Deutscher*, 500 U.S. 901, 111 S.Ct. 1678, 114 L.Ed.2d 73 (1991); *Evans v. Lewis*, 855 F.2d 631, 636–37 (9th Cir.1988); *Chambers v. Armontrout*, 907 F.2d 825, 830–31 (8th Cir.1990); *Blanco v. Singletary*, 943 F.2d 1477, 1500 (11th Cir.1991); *Loyd v. Whitley*, 977 F.2d 149, 158 (5th Cir.1992); *Nealy v. Cabana*, 764 F.2d 1173, 1178 (5th Cir.1985).

**12.** The doctors received this information either from Hendricks directly during the interview, from Hendricks's confession to the crimes, or from the transcript of the pretrial hearing. Based on these sources, one or both doctors would have known the following information:

Hendricks's mother died in childbirth. Ex. 31 at 81; GB Notes 7/4/81 at 1, 2–3. Hendricks had an unstable childhood, shuttling from one family home to another, Carson Rept. at 1; GB Notes 7/4/81 at 1. Hendricks lived with his paternal grandmother in Alabama and was subjected to racial discrimination. Carson Report at 1. Hendricks did poorly in school. GB Notes 7/4/81 at 1. Hendricks's father ran an after-hours bar and house of prostitution, Carson Report at 1; GB Notes 7/4/81 at 1. Hendricks had an affair with his stepmother while he was living with his father in Ohio, Carson Report at 1; GB Notes 7/4/81 at 1. When Hendricks was 13, he went to Detroit to live with his older brother. Hendricks went out looking for a job and was picked up by a man who said that he could help him. Hendricks went with the man to his apartment and was raped. Hendricks attempted suicide by overdose. Carson Report at 2; GB Notes 7/9/81 at 1. Hendricks left Detroit and spent three years living in New York and working as a "murphy" for a woman prostitute. GB Notes 7/4/81 at 3. After that, Hendricks spent several years working at various jobs in Detroit. Carson Report at 2; GB Notes 7/4/81 at 5; Hendricks had a history of heroin abuse. GB Notes 7/4/81 at 3–4, 6 and of cocaine use, GB Notes 7/9/81 at 2.

Hendricks was married twice. GB Notes 7/4/81 6–7. In September 1979 Hendricks met and fell in love with Rowena Bates. Hendricks lived with Bates and her son in Seattle. Bates left Hendricks in June 1980 for both emotional and financial reasons after Bates's 9–year old son was raped. Carson Report at 2; GB Notes 7/4/81 at 5–6. The breakup of the relationship was very difficult for Hendricks. Carson Report at 2; GB Notes 7/9/81 at 3. He began drinking 1 to 2 pints of gin per day and was depressed. Carson Report at 2; GB Notes 7/9/81 at 2–3; Ex. 31 at 51, 66. Hendricks started living with Annette Stone. Carson Report at 2; GB Notes 7/9/81 at 3. During this time Hendricks had trouble controlling his temper. Carson Report at 2; GB Notes 7/9/81 at 5. Hendricks also had difficulty getting a job. He resorted to male prostitution. Carson Report at 2. Hendricks was drinking around the time of the murders. GB Notes 7/4/81 at 5; GB Notes 7/9/81 at 2.

**13.** Hendricks's argument that inadequate investigation undermined trial counsel's chosen defense strategy is also unpersuasive. It is unlikely that a social history investigation would have so enhanced the value of Dr. Carson's testimony for the guilt phase that trial counsel would have been persuaded to present her as a witness despite the risk. Accordingly, even if trial counsel had conducted a social history investigation, it would not have been unreasonable for him to decide nonetheless that Dr. Carson should not testify in the guilt phase because the prosecutor would then be permitted to tell the jury about the Los Angeles and Oakland murders.

The court also rejects Hendricks's remaining argument about the extent of trial counsel's guilt phase investigation. The argument is unavailing because Hendricks identifies no specific information that trial counsel could have discovered about the victims or about Annette Stone had it conducted further investigation at the time of trial.

tion's case for first-degree and felony murder. Counsel believed that Dr. Carson's testimony would be useful to the defense to corroborate the description of events given by Hendricks in his taped confession. In particular, trial counsel hoped to show through Dr. Carson's testimony that Hendricks did not premeditate and that he stole from the victims only as an afterthought to killing them.[14]

At the close of the prosecution's case, trial counsel filed a motion in limine seeking to bar cross-examination of Dr. Carson on the subject of the Los Angeles and Oakland murders. The trial court heard defense counsel's offer of proof outside the presence of the jury and denied the motion. 14 RT 34–52, 14A RT. Counsel then decided that the benefits of Dr. Carson's testimony were outweighed by the risk of prejudice to Hendricks that would result once the jury heard about the Los Angeles and Oakland killings. 14 RT 51.

### b. Analysis

Hendricks argues that trial counsel should have litigated the admissibility of other crimes evidence before trial. Had this been done, Hendricks believes, trial counsel would have known that the other crimes evidence would be admitted for purposes of impeachment. Hendricks therefore argues that trial counsel would have conducted voir dire of potential jurors on the subject of other crimes evidence. Hendricks contends that this strategy would have lessened the effect on the jury of the Los Angeles and Oakland killings. According to this argument, trial counsel would not have been forced to forego the favorable testimony of Dr. Carson in the guilt phase.

Trial counsel's testimony was emphatic that he had not wanted the jury to hear about the Los Angeles and Oakland killings because the information could prejudice the jury against Hendricks. In Hendricks's case, this was not an unreasonable tactical decision for trial counsel to make.

Trial counsel faced a very tough decision when considering whether to put forward a defense that would permit evidence of the Los Angeles and Oakland murders to be admitted as impeachment. Trial counsel had to evaluate whether the jury would be able to fairly decide Hendricks's guilt for the San Francisco murders if the other crimes evidence were introduced. Trial counsel also had to assess the degree of prejudice that the other crimes evidence might create. Specifically, trial counsel had to determine whether the prejudice of the other crimes evidence would be outweighed by the advantages of letting the evidence come in i.e., that the jury would hear Dr. Carson's testimony and not hear about the Los Angeles and Oakland murders for the first time in the penalty phase.

This is a difficult tactical assessment to make even for the most experienced criminal defense lawyer. Even if trial counsel had litigated the admissibility of the other crimes evidence before trial, he could still reasonably conclude that the proper strategy was to forego Dr. Carson's testimony in the guilt phase (and therefore ask no questions of prospective jurors regarding other crimes evidence).

In light of these facts, the court finds that trial counsel exercised reasonable professional judgment in his approach to the other crimes evidence.

### 3. Miscellaneous claims of ineffective assistance in the guilt phase

Hendricks makes several additional claims that he received ineffective assistance of counsel in the guilt phase: 1) that trial counsel failed to make effective use of second counsel; 2) that trial counsel failed to file sufficient pretrial motions; and 3) that trial counsel failed to make meaningful use of available resources concerning capital litigation. These were described by James Larson, Hendricks's capital case legal expert, as secondary aspects of trial counsel's deficient performance.

---

**14.** Dr. Carson had prepared a written report in which she stated that "at the time of the alleged offenses, [Hendricks] was suffering from an Adjustment Disorder with Mixed Disturbance of Emotions and Conduct." Carson Report 11/8/81 at 3. Dr. Carson wrote that Hendricks killed as the consequence of uncontrolled rage triggered by situations that reminded him of the experience of being raped at age 13. Carson Report 11/8/81 at 3–4.

Hendricks urges the court to consider these secondary aspects of trial counsel's performance as part of the totality of circumstances relating to the quality of representation he received at trial. The court recognizes that claims of ineffective assistance of counsel must be evaluated in light of the record as a whole. It is not clear, however, whether these secondary aspects of trial counsel's purported ineffectiveness should be considered as performance or prejudice issues.

Almost by definition these secondary factors do not stand alone as sufficient indicators of deficient performance though they do contribute to an overall impression that trial counsel's decision-making process regarding the guilt phase was somewhat muddled. Nonetheless, the court is not persuaded that these factors alter the conclusion that trial counsel provided constitutionally adequate representation by pursuing a defense strategy which was reasonable on its own terms— i.e., keeping from the jury the evidence of the Los Angles and Oakland killings. Moreover, apart from prejudice already alleged and discussed above, Hendricks has not shown how these secondary factors prejudiced him.

#### 4. Summary

To summarize, the court finds that trial counsel made a definite strategic decision that above all he wanted to keep out the evidence of the three additional murders. Trial counsel understood that the price of this strategy was to forego presentation of an insanity or diminished capacity defense and to withhold Dr. Carson's testimony in the guilt phase.

The temptation to second-guess trial counsel's strategy decision is perhaps especially strong here where counsel's approach in retrospect might appear singleminded and where the extent of the investigation done beforehand was less than ideal. On the facts of this case, however, the court cannot say that trial counsel's strategy for the guilt phase was unreasonable. The other crimes evidence posed a distinct possibility of severe prejudice [15] to Hendricks in the guilt phase. Although trial counsel took a risk in not presenting Dr. Carson's testimony in the guilt phase, at the same time he avoided the risk that the jury would be prejudiced against Hendricks upon hearing about the Los Angeles and Oakland murders.

Evaluating these risks must be one of the hardest judgment calls that a criminal defense lawyer has to make.[16] On the facts of this case, the choice of defense strategy made by trial counsel falls well within the range of reasonable professional judgment. The court therefore finds that Hendricks has not shown that he is entitled to relief on grounds of ineffective assistance of counsel in the guilt phase.

#### C. Analysis: Penalty Phase

Hendricks argues that trial counsel failed to investigate and present mitigating evidence, that the case actually presented by trial counsel was conducted incompetently, and that but for these errors the jury would have returned a sentence less than death. Respondent argues that trial counsel made reasonable strategy choices and that any deficiencies in counsel's performance were not prejudicial.

15. In recognizing the potential for prejudice, the court does not accept respondent's argument that the evidence of the other murders was so aggravating in the penalty phase that the failure to present of additional mitigating evidence (or to corroborate that which was presented) was neither unreasonable nor prejudicial. As discussed in part C, below, trial counsel had every incentive to present as much mitigating evidence as possible precisely because the prosecutor was sure to introduce evidence of the Los Angeles and Oakland murders. Further, the availability of a substantial amount of evidence that would support both statutory and nonstatutory mitigating factors demonstrates that the failure to pres-

ent this evidence was prejudicial. The evidence in aggravation, although substantial, was not overwhelming when balanced against the mitigating evidence that could have been presented and either was not presented or was presented but not corroborated.

16. Furthermore, this is a judgment call that trial counsel was used to making. Although trial counsel had never first-chaired case that went to the penalty phase and had second-chaired in only one other penalty case, he was an experienced criminal defense lawyer in homicide cases.

### 1. State proceedings

The penalty phase of Hendricks's trial began four days after the guilt phase. The prosecutor gave an opening statement in which he told the jury that they would hear evidence that Hendricks committed five murders. 18 RT 3–11. Trial counsel informed the jury that he would present evidence from Rowena Bates, Hendricks's ex-girlfriend, and Dr. Linda Carson to show that Hendricks had a difficult life and to show Hendricks's good points.[17] 18 RT 12–13.

On this first day and continuing through the morning of the next day, the prosecutor presented extensive evidence of the Los Angeles and Oakland homicides. After the prosecution rested, defense counsel began the penalty case with testimony from Rowena Bates. 19 RT 31.

Ms. Bates's direct testimony was brief.[18] She testified about her live-in relationship with Hendricks and about the close relationship Hendricks had with her son Teal. 19 RT 32–33. According to her testimony, Hendricks had a very positive effect on Teal. 19 RT 33–35. Ms. Bates testified that during her relationship with Hendricks her son was sexually assaulted by a neighborhood boy[19] and that the incident "affected [Hendricks] very deeply." 19 RT 38. She testified that Hendricks was very upset and that he talked to her about what happened to him when he was young. 19 RT 39.[20]

Ms. Bates testified that Hendricks was continually employed during most of their relationship and that he was conscientious about bringing home his paycheck and deciding with her what to buy and how much to save. 19 RT 34–35. Ms. Bates described Hendricks as a family man, 19 RT 34, and testified that she and her son both still loved

him. At the close of her direct testimony, Ms. Bates stated that Hendricks had done good things in his life and that even if he were in prison for the remainder of his life he would continue to help others. Ms. Bates urged the jury to show mercy towards Hendricks. 19 RT 37.

The second witness presented on Hendricks's behalf was Dr. Carson. 19 RT 39–125; 20 RT 1–5. Dr. Carson testified that she gave Hendricks a primary diagnosis of adjustment disorder with mixed disturbance of emotions and conduct and an underlying diagnosis of antisocial personality disorder. 19 RT 45. Dr. Carson gave a chronology of events in Hendricks's life from childhood to adulthood that she believed were important to understanding why Hendricks committed the murders. 19 RT 45–84, 86–8, 91.

On cross-examination, Dr. Carson was asked repeatedly whether she had verified the facts about Hendricks's life on which her opinion and diagnosis were based. 19 RT 98–104; 107–10, 112–17. Dr. Carson testified that she had not talked to anyone in Hendricks's family, but that she discussed Hendricks and verified some facts with Rowena Bates. 19 RT 98–100.[21]

Following a brief recess, Hendricks testified on his own behalf. 20 RT 7. Hendricks stated that the facts about his life recounted the previous day by Dr. Carson were accurate. Hendricks also admitted responsibility for the two San Francisco murders and for the Los Angeles and Oakland homicides. 20 RT 8. Hendricks expressed remorse and took responsibility for his crimes. Hendricks also told the jury that he had had a difficult life. 20 RT 10–11.

---

17. Counsel explained to the jury that he had decided not to present Dr. Carson's testimony in the guilt phase because this would have resulted in admission of the evidence of the other three murders and he feared that this would bias the jury in favor of a conviction. 18 RT 12–13.

18. Ms. Bates's testimony on direct covered only six pages of trial transcript. See 19 RT 31–37. Cross-examination and redirect were also brief. See 19 RT 37–39.

19. The prosecutor objected on hearsay grounds to testimony about the details of the assault be-

cause Ms. Bates did not witness the incident. 19 RT 38–39. The trial court sustained the objection. 19 RT 39.

20. Ms. Bates's testimony is not specific about what Hendricks discussed with her about his life.

21. On redirect the following day, Dr. Carson also testified that the information she received from Hendricks was consistent with the diagnosis she made of him. 20 RT 1–2.

On cross-examination, Hendricks testified that he was aware of what he was doing at the time he committed the murders and that he knew he would be punished for them. 20 RT 13. Hendricks also testified that he committed the murders out of self-defense and hate. 20 RT 14. On direct and redirect, Hendricks described himself at the time of the killings as not caring about others or about himself, that he was in a rage. 20 RT 15–16. Hendricks also testified that this had changed; he said that he cares about people. 20 RT 17.

At the end of his testimony on redirect, Hendricks confessed to a sixth homicide. 20 RT 16. Hendricks testified on re-cross that he wanted to confess to this crime because "I know I am going to get the death penalty anyway so I clear my own conscience." 20 RT 17.

The prosecutor called Dr. Victor Reus, a psychiatrist, as a rebuttal witness. 20 RT 19–20. Dr. Reus concluded that Hendricks had the mental capacity to form specific intent to kill, to premeditate, to harbor malice, and to exhibit a wanton disregard for human life. 21 RT 28–30; 20 RT 39–40. Dr. Reus also testified over defense counsel's objection that the pattern of gunshot wounds on the victims was not characteristic of an action taken in an emotionally agitated state. 20 RT 35. Dr. Reus testified that, even if Hendricks was in a state of rage at the time of the killings, Dr. Reus did not believe that this fully explained Hendricks's actions. 20 RT 36–7.

On cross-examination, Dr. Reus testified that he had met with Hendricks for only an hour, that he would prefer to have more time with a defendant before testifying in such a serious matter, and that one of the problems with such a brief examination is that the subject might be reluctant to reveal his true emotions. 20 RT 45, 47–49, 50–52.

In proceedings outside of the jury's presence, trial counsel stated for the record that Hendricks took the stand on his own behalf

against the advice of counsel. 20 RT 53. Defense counsel also stated that he had requested a continuance until the following morning for closing arguments so that he could consider how to deal with Hendricks's apparent confession to a sixth homicide. 20 RT 53–54. The trial court initially denied defense counsel's request. 20 RT 55.

Following the noon recess, the court took a statement on the record from the attorney who prosecuted the sixth homicide to which Hendricks confessed. 20 RT 57–58. The prosecutor informed the court that two defendants were tried for the homicide and that the jury failed to reach a unanimous verdict in both cases. 20 RT 57–58. The trial court then concluded that a continuance until the following day would be appropriate and granted defense counsel's request. 20 RT 59.

Proceedings the following day began with argument outside of the jury's presence. Defense counsel and the prosecutor agreed not to reopen Hendricks's case to try the sixth homicide for which Hendricks confessed during his penalty phase testimony. 21 RT 1–2. The court agreed to instruct the jury to disregard the sixth homicide because Hendricks's guilt had not been proven beyond a reasonable doubt. 21 RT 2–3.

The prosecutor's closing argument for the penalty phase concentrated on the jury instruction for mitigating and aggravating factors, CALJIC § 8.84.1. The prosecutor outlined for the jury the statutory factors and then discussed the evidence in light of those factors. 21 RT 5–32.[22]

Defense counsel did not discuss the statutory criteria in detail.[23] He informed the jury that this was the first time he had argued a penalty case. 21 RT 32. Trial counsel emphasized that "what you decide is aggravating or mitigating is up to you, and the worst part of it is how do you compare? What is the formula?" 21 RT 34.

Trial counsel then informed the jury that he was personally opposed to the death pen-

---

22. The prosecutor also argued to the jury that they should disregard Hendricks's apparent confession to a sixth homicide. 21 RT 9–10.

23. Trial counsel only told the jury that the prosecutor had informed them accurately about the statutory mitigating and aggravating factors. 21 RT 33.

alty, and explained the philosophical and practical reasons for his position. 21 RT 35–6. He concluded this part of his argument to the jury by stating that "I think it is unfair that you should have this responsibility, but again, it's just my opinion." 21 RT 37.

Trial counsel next appealed to the jury to show mercy towards Hendricks. Without referring to specific mitigating factors that the jury might find under the statute, counsel argued that the jury could show mercy towards Hendricks because the law leaves to the jury the decision of what is relevant to their penalty determination. 21 RT 37. Trial counsel acknowledged that the five homicides were factors in aggravation. 21 RT 38.

Counsel discussed some of the events in Hendricks's life that called for the jury to have mercy on him. Counsel reminded the jury that Hendricks lost his mother in childbirth, that at age ten he had a sexual relationship with his stepmother and was abandoned by his father as a result, that he was raped at age thirteen, that he left his brother because he was not being cared for and was then taken in by a prostitute. 21 RT 38–39. Again without referring to specific mitigating factors in the statute, counsel urged the jury to consider these events as factors in mitigation.

Counsel asked the jury to "look at the totality of the man's life," and to vote for life imprisonment because of Hendricks's redeeming features. 21 RT 39. Counsel emphasized in particular that Hendricks had shown a capacity for reflection, remorse, and good deeds, and that he could continue to have a positive effect on others even in prison. 21 RT 39–42.

Counsel urged the jury not to vote for death on grounds of vengeance or deterrence. 21 RT 43–4. Counsel's final appeal to the jury in favor of a life sentence was that "killing begets killing," while "mercy begets mercy." 21 RT 45–46.[24]

In the final closing argument, the prosecution emphasized that the jury had a rational way to make its decision based on the statutory mitigating and aggravating factors. The prosecutor also asked the jury to consider whether Hendricks might be dangerous in prison if given a life sentence. 21 RT 48.

The trial court instructed the jury immediately after the prosecutor's final closing. 21 RT 49–54. The court first read CALJIC § 8.84.1. 21 RT 49–51. The court then gave a definition of reasonable doubt. 21 RT 51–2. The court instructed the jury on the definition of murder under California law and told the jury to disregard Hendricks's comments regarding a sixth homicide. 21 RT 52.

The jury began deliberations at 11:30 a.m. Just before 3 p.m., the jury asked the court for a definition of the term "aggravating." 21 RT 57.[25] The court interpreted the jury's request as asking for a definition of both aggravating and mitigating. 21 RT 57. Over defense counsel's objections, the trial court gave the jury a modified dictionary definition of those terms. 21 RT 59–60. The jury resumed deliberations at 3:05 p.m. and returned a verdict of death at 5:25 p.m. 21 RT 60–61.

### 2. Trial counsel's performance

Hendricks argues that 1) trial counsel failed to investigate and present mitigating evidence; 2) trial counsel failed to investigate and present evidence to corroborate the facts told by Hendricks about himself to Dr. Carson; 3) trial counsel should have made use of the statutory mitigating factors both in presentation of evidence and in argument to the jury; 4) trial counsel made inadequate use of the testimony of Rowena Bates; 5) trial counsel should have dissuaded Hendricks from testifying or should have prepared him better; and 6) trial counsel failed to investigate evidence that would be used in aggravation against Hendricks.

Respondent disputes Hendricks's characterization of trial counsel's investigation of

---

**24.** At the end of defense counsel's argument, Hendricks interjected: "I killed six people cold-blooded." 21 RT 47. Counsel responded by arguing to the jury that they should not help Hendricks to commit suicide. 21 RT 47.

**25.** Initially the jury asked for a dictionary. The trial judge denied the request and informed the jury that they should ask in writing for a definition of specific terms. 21 RT 57.

mitigating evidence as inadequate. Further, respondent argues that any limits on investigation constituted a reasonable tactical decision by trial counsel.

### a. Legal standard

■ Trial counsel has a duty to conduct a timely investigation for mitigation evidence. Pretrial preparation in a capital case is especially crucial in light of the seriousness of the charges. *See Magill v. Dugger,* 824 F.2d 879, 886 (11th Cir.1987); *see also Blanco v. Singletary,* 943 F.2d 1477, 1501–2 (11th Cir. 1991) ("To save the difficult and time-consuming task of assembling mitigation witnesses until after the jury's [guilt] verdict almost ensures that witnesses will not be available"); *Armstrong v. Dugger,* 833 F.2d 1430, 1433 (11th Cir.1987) (noting that trial counsel's testimony demonstrated that his penalty phase preparation was negligible).

■ The presumption that trial counsel rendered competent assistance is rebutted where the petitioner shows that trial counsel's decisions resulted from a lack of diligence in preparation and investigation. *See Kenley v. Armontrout,* 937 F.2d 1298, 1304 (8th Cir.1991). "Failing to interview witnesses or discover mitigating evidence relates to trial preparation and not trial strategy." *Kenley,* 937 F.2d at 1304.

■ Even if a decision not to investigate is a tactical choice, it must be reasonable. The reasonableness of such a decision must be evaluated in light of what trial counsel knew or should have known at the time. *Kenley,* 937 F.2d at 1304. "A particular decision not to investigate must be directly assessed for reasonableness under all of the circumstances, applying a heavy measure of deference to counsel's judgments." *Kimmelman v. Morrison,* 477 U.S. 365, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986).

■ A decision not to present mitigating evidence in the penalty phase is not necessarily ineffective assistance of counsel. "However, such decisions must flow from an informed judgment ... [and not] from neglect." *Harris v. Dugger,* 874 F.2d 756, 763 (11th Cir.1989).

### b. Evidentiary hearing testimony

■ Trial counsel testified that he did not ask the investigators to conduct a social history investigation or to perform any investigation related to preparing for the penalty phase. RB 35–36. Trial counsel testified that he conducted no investigation himself into mitigating evidence for the penalty phase. RB 35, 72. Counsel conceded that such an investigation should have been done, RB 75–76, and that the failure to do so was not motivated by concern about damaging rebuttal. RB 58, 69–70.

Trial counsel testified that Drs. Bach-y-Rita and Carson were not asked to evaluate Hendricks for penalty phase purposes. RB 46; MG 30, 33. Dr. Bach-y-Rita confirmed that he was not asked to consider penalty phase issues when he examined Hendricks. GB 32.

Trial counsel testified that he approached Hendricks's penalty trial thinking, "Let's put on what we have and beg for mercy." RB 115. Trial counsel stated that at the time he viewed the penalty phase as a "strange blip" that follows what is otherwise a typical homicide case. RB 64. Along the same lines, trial counsel described his previous view of the instruction that the judge would give to the jury on mitigating and aggravating circumstances as "statutory verbiage." RB 150.

Trial counsel testified at the evidentiary hearing that there was no penalty phase strategy formulated in advance. RB 46, 53–57. Trial counsel also testified that no investigation was done of the Los Angeles and Oakland murders though he realized that evidence of these homicides would be admitted in the penalty phase as aggravating evidence. RB 134–35.

### c. Analysis

The facts underlying Hendricks's claim that his trial counsel rendered deficient performance are largely undisputed. The question whether trial counsel's performance was constitutionally adequate depends on how the state court record and the evidentiary hearing testimony are interpreted in light of the legal standards discussed above.

### (1) Investigation of mitigating evidence [26]

The evidence is undisputed that neither trial counsel nor his investigators conducted any investigation directed specifically at developing mitigating evidence. Further, there is no evidence that trial counsel's decision not to investigate penalty phase issues was strategic in nature. Finally, the facts of this case provide no discernible basis for trial counsel to have made a reasonable strategy decision to limit investigation of mitigating evidence.

Respondent argues that trial counsel made a reasonable strategy decision to limit investigation of mitigating evidence based on the evaluations made of Hendricks for the guilt phase by Drs. Carson and Bach-y-Rita. The argument is unpersuasive not only because there is no evidence to support it but also because such a decision would be unreasonable on the facts of this case.

The mental health issues in the guilt and penalty phases are not identical. Consequently, it would not be reasonable for trial counsel to forego an investigation of Hendricks's life for the penalty phase based on the conclusion that a diminished capacity or insanity defense was not viable in the guilt phase. If anything, the facts about Hendricks's life that came to light when Hendricks was evaluated by Drs. Bach-y-Rita and Carson for the guilt phase put counsel on notice that a penalty phase investigation would be highly fruitful.[27] Consequently, if trial counsel had looked to the preparations made for the guilt phase as an indication of what to do for the penalty phase, he would have located witnesses and documents to prove to the jury that the facts of Hendricks's life constituted substantial evidence in mitigation.

Respondent's alternative argument that trial counsel did not conduct a penalty phase investigation because he reasonably decided to focus his effort on the guilt phase is unpersuasive for similar reasons. First, the transcript of the guilt phase and the evidentiary hearing testimony do not support respondent's description. Counsel did not plan an extensive investigation of the crimes and intended to present the testimony of only one witness in the guilt phase. He withdrew this plan once it became clear that this would conflict with his overriding strategy to keep from the jury the evidence of the Los Angeles and Oakland murders. As such, the record of the guilt phase does not support respondent's inferences about trial counsel's strategy.

Second, the strategy decision that respondent attributes to trial counsel cannot be considered reasonable on the facts of this case. In light of the aggravating evidence that the prosecutor was sure to introduce in the penalty phase, trial counsel had every incentive to focus his efforts at least equally on the penalty phase as on the guilt phase.

For the above reasons, respondent's efforts to rationalize by hindsight trial counsel's failure to conduct a reasonable penalty phase investigation are unavailing. Even if it were appropriate to speculate about trial counsel's penalty phase strategy without evidence in the record to support such speculation, the inferences made by respondent do not advance the position that trial counsel acted reasonably under the circumstances.

**26.** Hendricks also argues that trial counsel was ineffective for failing to conduct an adequate investigation of evidence that would be introduced against Hendricks in aggravation. The fact that trial counsel did not investigate the Los Angeles and Oakland murders is not disputed. Nonetheless, Hendricks has not pointed to facts that might have been uncovered that would have helped counsel to undermine the prosecution's penalty case. Accordingly, the court has no basis to determine whether Hendricks was prejudiced any deficiencies in investigation of the other crimes. The court notes, however, that trial counsel's failure to conduct an adequate investigation of the other crimes further supports the conclusion that, due to inexperience, trial counsel had no strategy in the penalty phase and did not understand the concept of a fully-developed penalty phase case.

**27.** In addition, trial counsel testified that he did not fear that a penalty phase investigation would uncover damaging rebuttal evidence. This testimony is credible because the record contains no evidence from which that trial counsel might reasonably conclude that investigation could do more harm than good.

### (2) Presentation of mitigating evidence

The penalty phase transcript reveals no coherent penalty phase strategy by trial counsel.[28] Moreover, this court cannot presume that trial counsel's approach to the penalty phase was strategic because, as noted above in section 1, reasonable efforts were not made to locate witnesses and documents for presentation as mitigating evidence.

Trial counsel planned initially to present only two witnesses. The testimony of Hendricks's ex-girlfriend Rowena Bates was relevant but very limited considering the mitigating evidence that she might have offered based on the close relationship she and her son had with Hendricks. Ms. Bates could not testify in any detail about the incident in which her son Teal was raped because she was not a witness. Even so, her testimony about the effect of the rape on Hendricks was very brief. Moreover, the oblique reference to Hendricks's discussion with her of what happened to him did little to corroborate a significant and traumatic event in Hendricks's life that was highly relevant to establishing a factor in mitigation.

Dr. Carson's testimony was also relevant to the issue of penalty but its value was undermined almost completely by the lack of corroboration for the underlying facts about Hendricks's life and family background. The prosecutor's cross-examination of Dr. Carson was, as Hendricks's legal expert testified, both devastating and predictable. JL 88; MT 33, 45.

Aside from the absence of corroboration, Dr. Carson's testimony was not developed in light of the applicable statutory and nonstatutory mitigating factors. Trial counsel's opening and closing statements also provided little guidance to the jury about how to evaluate the evidence presented by Rowena Bates and Dr. Carson as factors in mitigation. In light of trial counsel's failure to discuss the factors that would actually govern the jury's decision between life without parole and death, trial counsel's abstract plea for mercy based in part on his own opposition to the death penalty was particularly ineffectual.

The record shows that, just as trial counsel testified, he went with what he had and begged for mercy. This approach and the lack of preparation underlying it is consistent with trial counsel's testimony that he viewed the penalty phase was a "strange blip" at the end of a regular homicide case. Trial counsel's testimony that he considered the statutory mitigating and aggravating factors to be "statutory verbiage" is also reflected in the lack of argument on these factors in trial counsel's opening and closing statements, in the overall lack of focus on developing a penalty phase case in light of those factors, and in a very limited effort to connect the evidence that counsel did present on Hendricks's behalf to the relevant statutory and nonstatutory mitigating circumstances.

The court recognizes that trial counsel may have an incentive to admit error in the hope of assisting a former client who has been sentenced to death. *Cf. Atkins v. Singletary,* 965 F.2d 952, 960 (11th Cir.1992); *Harris v. Dugger,* 874 F.2d 756, 761 n. 4 (11th Cir. 1989). In this case, however, counsel's testimony is credible and supported by the state court record.

The penalty phase transcript, combined with the fact that trial counsel conducted no penalty phase investigation, demonstrate that trial counsel's performance was the product of inexperience rather than strategy.[29] By contrast, the strategies that respondent attributes to trial counsel with regard to presentation of mitigating evidence are neither evident from the record nor reasonable on the facts of this case.[30]

---

**28.** Trial counsel's testimony that they had no strategy for the penalty phase is therefore credible.

**29.** Although first chair counsel was an experienced lawyer in homicide cases, his only prior penalty phase experience before Hendricks was as second chair in another case. For his part, second chair counsel testified that his involve-

ment in the penalty phase of Hendricks's case was tangential.

**30.** Respondent advances the same strategic rationales to explain both the lack of investigation and presentation of mitigating evidence. For the reasons discussed in section 1., above, these arguments are unavailing.

Trial counsel knew many facts in Hendricks's life history that could have been presented to the jury as mitigating evidence. Trial counsel testified that he was not concerned about the possibility of uncovering damaging rebuttal evidence by investigating and presenting mitigating evidence about Hendricks's personal and family history. The record contains no evidence to indicate that investigating and presenting this evidence might do more harm than good.[31] Rather, there appears to have been no risk to developing and presenting the facts of Hendricks's life in detail. In light of the aggravating evidence that the prosecution would introduce to show that Hendricks had committed five murders, trial counsel had every reason to present as much mitigating evidence as possible.

Trial counsel's testimony that he viewed the contents of CALJIC § 8.84.1 as "statutory verbiage" further shows a lack of understanding of what the penalty phase was about. No doubt trial counsel's conception of the statute and corresponding instruction as mere words contributed to his failure to investigate and present witnesses and to corroborate the testimony of those witnesses who did testify.

The aggravating and mitigating factors set forth in the instruction are the criteria that the judge tells the jury to consider when deciding whether a defendant will suffer life imprisonment without possibility of parole or the death penalty.[32] Those factors have to be the cornerstone of preparing for the penalty phase even in a case where trial counsel's strategy is to plead for mercy. A plea for mercy in the abstract will have little effect if trial counsel fails to give an adequate basis in law and fact upon which the jury could express compassion for a defendant by sparing him the penalty of death.

Based on a thorough review of the pleadings and exhibits, the state court record, and the evidentiary hearing testimony, the court concludes that trial counsel's performance in the penalty phase did not meet the constitutional minimum standard for investigation and presentation of mitigating evidence. Accordingly, it must be determined whether there is a reasonable probability that, but for counsel's errors, the jury would have concluded that the balance of mitigating and aggravating circumstances did not warrant the sentence of death.

### 3. Prejudice

Hendricks maintains that he was prejudiced by trial counsel's deficient performance in the penalty phase. Hendricks points to the existence of a substantial amount of mitigating evidence about his life and family background that was either not presented, not corroborated, or not connected to the applicable statutory and nonstatutory mitigating factors. In addition, Hendricks emphasizes that when the penalty phase was twice retried in his Los Angeles case and much of this mitigating evidence was presented, the jury failed to reach a verdict.

Respondent argues that Hendricks cannot show prejudice because the evidence in aggravation was overwhelming. In addition, respondent argues that the jury knew most of the important aspects of Hendricks's life that could be considered in mitigation. Finally, respondent disputes the relevance of the penalty phase result in the Los Angeles retrial.

### a. Legal standard

The Supreme Court has noted in numerous opinions on the constitutionality of the death penalty that, "[c]onsideration of [mitigating] evidence is a 'constitutionally indispensable part of the process of inflicting the penalty of death.'" *California v. Brown*, 479 U.S. 538, 554, 107 S.Ct. 837, 846, 93 L.Ed.2d 934

---

**31.** The evidence that as a young man Hendricks had been violent on some occasions with members of his family is not potentially so damaging that it would reasonably justify a decision to forego investigation and presentation of positive evidence about Hendricks from family members. *See* Exhibit D to Respondent's Memorandum Supporting the Answer. The potentially prejudicial impact on the jury of such evidence would seem particularly mild in light of the fact that the jury knew already in the penalty phase that Hendricks had killed five people.

**32.** As second chair counsel testified, the specification of aggravating and mitigating factors in the statute call out to be investigated. MG 84.

(1987)[33] (quoting *Woodson v. North Carolina*, 428 U.S. 280, 304, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944 (1976) (plurality)); *see also McCleskey v. Kemp*, 481 U.S. 279, 304, 107 S.Ct. 1756, 1773, 95 L.Ed.2d 262 (1987); *Eddings v. Oklahoma*, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982); *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) (plurality). In *Penry v. Lynaugh*, 492 U.S. 302, 326, 109 S.Ct. 2934, 2951, 106 L.Ed.2d 256 (1989), the Supreme Court reiterated the rationale for this requirement as follows: "[I]t is precisely because the punishment should be directly related to the personal culpability of the defendant that the jury must be allowed to consider and give effect to mitigating evidence relevant to a defendant's character or record or the circumstances of the offense." Furthermore, the Court emphasized that "in order to ensure reliability in the determination that death is the appropriate punishment in a particular case, the jury must be able to consider and give effect to any mitigating evidence relevant to a defendant's background, character, or the circumstances of the crime." *Penry*, 492 U.S. at 328, 109 S.Ct. at 2951, (citing *Woodson v. North Carolina*, 428 U.S. 280, 305, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944 (1976)).

In light of the significance of mitigating evidence about the individual's background and character to the accuracy and reliability of the capital sentencing process, courts have granted relief on grounds of ineffective assistance of counsel in cases where trial counsel did not investigate and present this evidence to the jury and had no reasonable tactical rationale for failing to do so.[34] In such cases, the existence of a substantial amount of mitigating evidence that was not presented to the jury is one factor relied upon to indicate that the petitioner was prejudiced by trial counsel's deficient performance. *See Armstrong*, 833 F.2d at 1432; *Blanco*, 943 F.2d at 1501; *Mak*, 970 F.2d at 620–22; *Deutscher*, 884 F.2d at 1160–61; *Waters*, 979 F.2d at 1497; *Stephens*, 846 F.2d at 653; *Middleton*, 849 F.2d at 493–95.

Even in cases where trial counsel's failure to present mitigating evidence was not complete, prejudice has been found when trial counsel failed to connect the evidence presented to the statutory or nonstatutory mitigating factors. *See Waters*, 979 F.2d at 1496; *Stephens*, 846 F.2d at 655; *cf. Card v. Dugger*, 911 F.2d 1494, 1513 (11th Cir.1990) (rejecting prejudice claim in part because trial counsel presented psychiatric testimony relevant to establishing two statutory mitigating factors); *Doyle v. Dugger*, 922 F.2d 646, 652 (11th Cir.1991) (same). By contrast, no prejudice has been found where the jury has heard substantially the same the evidence that the petitioner claims should have been presented. *See, e.g., Atkins v. Singletary*, 965 F.2d 952, 960 (11th Cir.1992); *Clozza v. Murray*, 913 F.2d 1092 (4th Cir.1990); *Coogan v. McCaughtry*, 958 F.2d 793 (7th Cir.1992); *Doyle*, 922 F.2d at 652; *Elledge v. Dugger*, 823 F.2d 1439, 1447–48 (11th Cir. 1987). Prejudice has also been rejected in cases where the court found that the mitigating evidence that was not presented would have opened the door to damaging rebuttal, *see, e.g., Burger v. Kemp*, 483 U.S. 776, 791, 107 S.Ct. 3114, 3124, 97 L.Ed.2d 638 (1987), and where the aggravating evidence was found to be overwhelming. *See Celestine v. Blackburn*, 750 F.2d 353 (5th Cir.1984); *Elledge v. Dugger*, 823 F.2d 1439, 1448 (11th Cir.1987); *Fitzgerald v. Thompson*, 943 F.2d 463, 470 (4th Cir.1991).

---

**33.** "[E]vidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse." *Brown*, 479 U.S. at 545, 107 S.Ct. at 841 (concurring opinion of O'Connor, J.).

**34.** *See, e.g., Armstrong v. Dugger*, 833 F.2d 1430 (11th Cir.1987); *Blanco v. Singletary*, 943 F.2d 1477, 1500 (11th Cir.1991); *Deutscher v. Whitley*, 884 F.2d 1152 (9th Cir.1989), *reversed on other grounds sub nom. Angelone v. Deutscher*, 500 U.S. 901, 111 S.Ct. 1678, 114 L.Ed.2d 73 (1991); *Evans v. Lewis*, 855 F.2d 631 (9th Cir.1988); *Harris v. Dugger*, 874 F.2d 756 (11th Cir.1989); *Kenley v. Armontrout*, 937 F.2d 1298 (8th Cir. 1991); *Magill v. Dugger*, 824 F.2d 879 (11th Cir.1987); *Mak v. Blodgett*, 970 F.2d 614 (9th Cir.1992); *Middleton v. Dugger*, 849 F.2d 491 (11th Cir.1988); *Stephens v. Kemp*, 846 F.2d 642 (11th Cir.1988); *Waters v. Zant*, 979 F.2d 1473 (11th Cir.1992).

Hendricks's claim of prejudice, and respondent's arguments in opposition, are considered below in light of these criteria.

### b. Analysis

The facts of Hendricks's life and family background as presented in this court are not disputed by respondent. Moreover, there is no dispute that this evidence is relevant to at least three statutory mitigating factors and to any nonstatutory mitigation.[35]

The state court record shows that the jury was aware of some of the important events in Hendricks's life. The jury learned these facts through Hendricks's taped confession and through the testimony of Rowena Bates, Dr. Carson, and Hendricks himself. The record also shows, however, that the persuasive force of this evidence was undermined substantially by the manner in which it was presented.

First, the jury was given little guidance about how to consider the facts it had about Hendricks's life and background to make the decision between a sentence of death and life without possibility of parole. Second, most of the information that the jury had about Hendricks's life and family came from Hendricks himself either directly (in his confession and penalty phase testimony) or indirectly (through the testimony of Dr. Carson).

The jury's only source of information about Hendricks's life and background other than Hendricks himself was Rowena Bates. Ms. Bates testified briefly about her relationship with Hendricks and about his reaction to the rape of her son Teal. In addition, Ms. Bates apparently verified some of the facts told by Hendricks about himself to Dr. Carson. Even this verification may not have carried much weight given that Ms. Bates's only sources of information were Hendricks himself and phone conversations with his father.

As noted in the previous discussion, the prosecutor emphasized heavily and to great effect that Dr. Carson had no corroboration for any of the facts about Hendricks's life

that she relied upon in formulating her psychological evaluation of him. Dr. Carson's opinion and conclusions about Hendricks were thus rendered suspect along with the underlying facts about Hendricks's life. *See Hendricks v. Vasquez,* 974 F.2d 1099, 1110 (9th Cir.1992). Furthermore, it is doubtful that the jury would find Hendricks himself to be a reliable or credible source of information. At the time that the jury heard most of the facts about Hendricks's life and background, they had just convicted him of two counts of first-degree murder with special circumstances, one count of burglary, and one count of robbery.

In light of these facts, Hendricks's case is distinguishable from those in which no prejudice was found because the evidence that trial counsel failed to present would have been merely cumulative of facts that the jury already knew. Rather, Hendricks's case is more akin to those where trial counsel presented no mitigating evidence at all because 1) the facts that the jury heard were not made believable, 2) the expert opinion relying on those facts was thus undermined, and 3) the jury had very little guidance from trial counsel about how to connect the facts and expert opinion about Hendricks's life and background to the mitigating factors in the statute that would govern the jury's decision between a sentence of death and life without possibility of parole.

Respondent has emphasized both in pleadings and in oral argument that the aggravating evidence in Hendricks's case was overwhelming to such an extent that there is no reasonable possibility that the presentation of additional mitigating evidence would have led the jury to choose a sentence of less than death. Furthermore, respondent urges the court to disregard the fact that the jury in the Los Angles retrial failed to reach a verdict on the penalty.

Respondent's arguments are unavailing. Both in exhibits to this court and in the Los Angeles penalty retrial Hendricks has pre-

---

**35.** *See* Cal.Penal Code §§ 190.3(d) (whether or not the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance); (h) (whether or not at the time of the offense the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect, or the effects of intoxication; (k) any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime.

sented a substantial amount of evidence in mitigation of the death penalty. Presented effectively, that evidence more than satisfies the *Strickland* standard of prejudice and demonstrates a reasonable probability that the jury would conclude that the balance of aggravating and mitigating factors calls for a sentence less than death.

The Supreme Court emphasized in *Strickland* and more recently in *Lockhart v. Fretwell,* —— U.S. ——, —— – ——, 113 S.Ct. 838, 842–43, 122 L.Ed.2d 180 (1993), that the cornerstone of the prejudice inquiry is whether the jury's verdict may be considered fair and reliable. In Hendricks's case, this requirement has not been satisfied.

Having determined that both the performance and prejudice elements of the *Strickland* test have been met in this case, the court finds that Hendricks was denied his Sixth Amendment right to the effective assistance of counsel in the penalty phase of his trial. As a matter of law and justice, Hendricks is therefore entitled to habeas corpus relief on the ground that his sentence of death was obtained in violation of his federal constitutional rights.

### IV. Order

For the reasons stated above in part III, IT IS HEREBY ORDERED:

1. Hendricks's petition for a writ of habeas corpus as to the conviction is DENIED;

2. Hendricks's petition for a writ of habeas corpus as to the penalty is GRANTED;

3. The sentence of death in this case is VACATED AND SET ASIDE, as are any state proceedings related to carrying out that sentence.

4. The state of California has 60 days to commence new sentencing proceedings in accordance with applicable state law and the federal constitution.

5. The clerk of the court will immediately notify the warden of San Quentin Prison and the California Attorney General of this court's ruling. *See* N.D.Cal.Local R. 296–12.

IT IS SO ORDERED.